**William G. ZUERN, Petitioner,**

v.

**Arthur TATE, Warden, Respondent.**

No. C–1–92–771.

United States District Court,
S.D. Ohio,
Western Division.

June 9, 2000.

---

Lawrence Joseph Greger, Sharon Lynn Ovington, Greger And Ovington, Dayton, OH, William Sheldon Lazarow, Assist. State Public Defender, Columbus, OH, for plaintiff.

Charles L. Wille, Assist. Atty. General, columbus, OH, for defendants.

DECISION AND ENTRY SUSTAINING RESPONDENT'S OBJECTIONS (DOCS. # 321 AND # 332) TO INITIAL AND SUPPLEMENTAL REPORTS AND RECOMMENDATIONS OF MAGISTRATE JUDGE (DOCS. # 320 AND # 329); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PETITIONER'S OBJECTIONS (DOCS. # 326 AND # 331) TO INITIAL AND SUPPLEMENTAL REPORTS AND RECOMMENDATIONS OF MAGISTRATE JUDGE (DOCS. # 320 AND # 329); INITIAL AND SUPPLEMENTAL REPORTS AND RECOMMENDATIONS (DOCS. # 320 AND # 329) ADOPTED IN PART AND REJECTED IN PART; WRIT OF HABEAS CORPUS CONDITIONALLY GRANTED; CERTIFICATE OF PROBABLE CAUSE ISSUED; LEAVE TO APPEAL *IN FORMA PAUPERIS* GRANTED; JUDGMENT TO BE ENTERED IN FAVOR OF PETITIONER AND AGAINST RESPONDENT ON THIRD CLAIM, IN PART, AND IN FAVOR OF RESPONDENT AND AGAINST PETITIONER ON ALL OTHER CLAIMS; TERMINATION ENTRY

RICE, Chief Judge.

The Petitioner William G. Zuern ("Petitioner" or "Zuern") was convicted of committing the offense of aggravated murder and sentenced to death by the Ohio courts. He has initiated this action, challenging the constitutionality of his conviction and the sentence imposed upon him, and seeking a writ of habeas corpus.

During portions of May and June, 1984, Petitioner was incarcerated in the Community Correctional Institute ("CCI"), located in Hamilton County, Ohio, awaiting trial on a charge of murder. On the evening of June 9, 1984, Joseph Burton ("Burton") and Phillip Pence ("Pence"), two deputy sheriffs employed at the CCI, were or-

dered to search Zuern's cell for weapons. After the door to that cell had been opened, the Petitioner lunged at Pence, stabbing him in the chest with a metal knife or shank that Zuern had fashioned out of a metal hook for a bucket. Pence died from the wounds inflicted by the Petitioner. Thereafter, Zuern was indicted for aggravated murder, in violation of Ohio Revised Code § 2903.01(A) (i.e., purposely causing the death of another, with prior calculation and design). The Indictment also charged the Petitioner with three death penalty specifications or aggravating circumstances under Ohio Revised Code § 2929.04(A). The case was assigned to Judge William Morrissey of the Hamilton County Court of Common Pleas. In accordance with the law in Ohio, the Petitioner's trial was bifurcated into guilt and penalty phases, with the same jury sitting on both. At the conclusion of the guilt phase, the jury found Zuern guilty of the offense charged and of the three death penalty specifications or aggravating circumstances. Before the separate punishment phase of the trial could commence, Zuern informed Judge Morrissey that he did not want to present mitigating evidence. As a result, no evidence was presented during that phase of the trial. After having received the court's instructions, the jury recommended that the death penalty be imposed. Judge Morrissey accepted that recommendation and sentenced Zuern to death.

Petitioner then appealed his conviction and the sentence imposed upon him to the Hamilton County Court of Appeals, setting forth five assignments of error, to wit:

1. The trial court had erred by overruling Petitioner's motion to dismiss for reason that the Ohio statutory scheme for the imposition of the death penalty is unconstitutional;

2. The trial court had abused its discretion by overruling Petitioner's motion for a view of the scene;

3. The trial court had erred when it failed to grant Petitioner's motion for a mistrial, when a prosecution witness informed the jury that he (Zuern) had been charged with murder at the time of the offense for which he was being tried;

4. The trial court erred by not, *sua sponte,* dismissing Beulah Taylor from the jury, after she disclosed to the court that she had heard a news account which stated that the Petitioner was in jail on another charge of murder, at the time he had allegedly committed the offense for which he was being tried; and

5. The verdict was against the weight of the evidence.

*See* Doc. # 88 at Ex. D. The Hamilton County Court of Appeals rejected Zuern's assignments of error and affirmed his conviction and, after conducting its own independent review on the issue of whether the evidence established beyond a reasonable doubt that the aggravating circumstances of which the Petitioner had been found guilty outweighed the mitigating factors, also affirmed the imposition of the death penalty upon him. *State v. Zuern,* 1986 WL 6507 (Ohio App.1986). Zuern then appealed to the Ohio Supreme Court, setting forth five propositions of law which tracked his assignments of error in the Hamilton County Court of Appeals. Over the dissent of Justices Craig Wright and Herbert Brown, the Ohio Supreme Court affirmed both Zuern's conviction and his sentence. *State v. Zuern,* 32 Ohio St.3d 56, 512 N.E.2d 585 (1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 872 (1988). Like the Hamilton County Court of Appeals, the Ohio Supreme Court conducted its own independent review on the question of whether the evidence established beyond a reasonable doubt that the aggravating circumstances of which the Petitioner had been found guilty outweighed the mitigating factors.

Having exhausted his direct appeals, Zuern initiated an action in the Hamilton County Court of Common Pleas, requesting post-conviction relief pursuant to Ohio Revised Code § 2953.21, and setting forth 14 claims. In particular, the Petitioner alleged that his conviction and sentence were void or voidable for the following reasons, to wit:

1. The prosecutor had suppressed evidence favorable to the Petitioner;

2. The state had used false evidence to obtain a conviction against him;

3. There was insufficient evidence to convict him of aggravated murder;

4. The prosecutor had impermissibly commented upon his right to remain silent;

5. The state had improperly introduced evidence of the sympathetic character of the victim and his family;

6. The jury was permitted to view him in shackles during his trial;

7. The prosecutor systematically used the state's peremptory challenges to exclude prospective jurors who had reservations about the death penalty;

8. The prosecutor's *voir dire* was impermissible;

9. In imposing the death penalty, the trial court impermissibly considered a presentence report;

10. That presentence report contained inflammatory and prejudicial information;

11. The trial court impermissibly permitted the Petitioner to waive his right to present mitigating evidence, without having first conducted a hearing to ascertain whether he was competent to do so;

12. The appellate courts were prevented from complying with their statutory duty of determining whether the evidence established beyond a reasonable doubt that the aggravating circumstances of which the Petitioner had been found guilty outweighed the mitigating factors, since he was permitted to waive his right to present mitigating evidence.

13. He was denied effective assistance of counsel by trial counsel; and

14. He was denied effective assistance of counsel by appellate counsel.

*See* Doc. # 90 at Ex. O. The Court of Common Pleas dismissed Petitioner's request for post-conviction relief, without affording him an evidentiary hearing. Petitioner then appealed to the Hamilton County Court of Appeals, which affirmed the decision of the trial court to dismiss the request for post-conviction relief.[1] *State v. Zuern*, 1991 WL 256497 (Ohio App.1991). The Ohio Supreme Court subsequently denied Petitioner's application for further review of this request for such relief. *State v. Zuern*, 64 Ohio St.3d 1423, 594 N.E.2d 624 (1992). While Zuern's application for further review was pending before the Ohio Supreme Court, he filed an application for delayed reconsideration in the Hamilton County Court of Appeals. After that court had denied Petitioner's application, he appealed to the Ohio Supreme Court, setting forth propositions of law relating to ineffective assistance of counsel by the attorneys who had represented him during his direct appeal. The Ohio Supreme Court declined to hear Petitioner's appeal. *See State v. Zuern*, 65 Ohio St.3d 1463, 602 N.E.2d 1172 (1992).

Zuern then initiated this action, requesting a writ of habeas corpus, alleging that his conviction and sentence violated a number of provisions of the United States Constitution. In particular, the Petitioner asserted 25 separate grounds or claims for relief. This Court referred the matter to Magistrate Judge Michael Merz for a Report and Recommendations on May 12, 1994. On December 8, 1998, after having resolved numerous discovery disputes and having conducted an evidentiary hearing, Judge Merz issued his Initial Report and Recommendations. *See* Doc. # 320. In particular, that judicial officer recommended that the Court deny the Petition-

er's request for a writ of habeas corpus, with respect to 24 of the asserted grounds, and that the Court conditionally grant the request with respect to one of the claims.[2] Both the Respondent (Doc. # 321) and the Petitioner (Doc. # 326) filed Objections to that judicial filing. On April 19, 1999, Judge Merz filed a Supplemental Report and Recommendations, in which that judicial officer recommended that this Court overrule both the Respondent's and the Petitioner's Objections. *See* Doc. # 329. Once again, both the Petitioner and the Respondent filed Objections to that filing by Judge Merz. *See* Docs. # 331 and # 332. On September 30, 1999, this Court, after noting that the Respondent had not filed a substantive response to the Petitioner's 134–page Objections to the Magistrate Judge's Initial Report and Recommendations (Doc. # 326), established a briefing schedule, whereby the Respondent would file a responsive memorandum and the Petitioner would, thereafter, be afforded the opportunity of filing a response. The Respondent has filed such a Memorandum (*see* Doc. # 335), and, on December 6, 1999, the Petitioner's Reply Memorandum was filed, *see* Doc. # 337, bringing this matter finally to issue before this Court.

■ This Court now rules upon the parties' Objections to Judge Merz' Initial and Supplemental Reports and Recommendations. As a means of analysis, this Court will initially address the Petitioner's Objections, following which it will turn to that of the Respondent. However, before engaging in that analysis, the Court will briefly set forth the standard of review it must apply when ruling upon such Objections. In *Flournoy v. Marshall*, 842 F.2d 875 (6th Cir.1988), the Sixth Circuit reiterated that a District Court must apply a *de novo* standard of review to the Report and Rec-

---

1. Before the Court of Appeals, the Petitioner also argued that the trial court had erred in dismissing his request for post-conviction relief and, further, that it had committed certain procedural errors in its handling of that request for relief.

2. The Magistrate Judge recommended that the Petitioner be released, unless he were granted a new trial within the time governed by Ohio's Speedy Trial Act.

ommendations of a Magistrate Judge in a habeas corpus proceeding. Accordingly, this Court reviews both Judge Merz' factual findings and his legal conclusions *de novo.*

### I. Petitioners' Objections (Docs. # 326 and # 331)

As is indicated, Judge Merz has recommended that this Court deny the Petitioner's request for a writ of habeas corpus, with respect to 24 of the 25 asserted grounds for relief. With his Objections, the Petitioner argues that the Magistrate Judge erroneously recommended against relief with respect to 20 of those 25 grounds.[3] In addition, the Petitioner has broadly objected to Judge Merz' application of the presumption of correctness and the rule of procedural default. In his Objections to that judicial officer's Supplemental Report and Recommendations, the Petitioner has merely incorporated his Objections to Judge Merz' Initial filing.[4] *See* Doc. # 331. Therefore, this Court will rule upon the Petitioner's 134-page Objections to the Magistrate Judge's Initial Report and Recommendations. *See* Doc. # 326. As a means of analysis, this Court will initially address the Petitioner's broad attacks, following which it will turn to his Objections to Judge Merz' recommendations that the Court deny the requested relief with respect to 20 of the grounds.

### A. Presumption of Correctness and Procedural Default

■ Since the Petitioner filed this action before the effective date of the Anti-

terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, the Respondent concedes that the amended version of 28 U.S.C. § 2254(d) is not applicable herein.[5] *See* Doc. # 335 at 3, n. 1. *See also, Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Thus, this Court applies the pre-amendment version of § 2254(d). Recently, the Sixth Circuit reiterated that under the pre-AEDPA version of § 2254(d), state court findings of historical facts are presumed to be correct and are rebuttable only in certain circumstances. *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 369, 145 L.Ed.2d 284 (1999). An individual seeking a writ of habeas corpus must rebut the presumption of correctness by clear and convincing evidence. *Id.*

■ In his Report and Recommendations, Judge Merz recommended that this Court hold that the Petitioner's Fifth, Eighth, Tenth through Sixteenth and Twenty–Fifth Claims are barred by a procedural default, to wit: the failure to raise the issues set forth therein on direct appeal of his conviction and sentence, thus bringing into effect the Ohio doctrine of *res judicata.* Petitioner has mounted a broad two-pronged attack on that recommendation, arguing that Judge Merz erroneously deferred to the factual findings by the Ohio courts, when he improperly concluded that those 10 Claims were procedurally defaulted.[6]

---

**3.** The Magistrate Judge recommended that the Court conditionally grant the requested relief with respect to the Sixth Claim. The Petitioner has not objected to Judge Merz' recommendations that the requested relief be denied with respect to the Twenty–First through Twenty–Fourth Claims. In the absence of objections to those Claims, the Court adopts the Magistrate Judge's Initial Report and Recommendations (Doc. # 320), with regard to Petitioner's Twenty–First through Twenty–Fourth Claims. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981).

**4.** In his Objections to the Magistrate Judge's Supplemental Report and Recommendations (Doc. # 331), the Petitioner also addresses the issue of a Certificate of Probable Cause.

**5.** Not surprisingly, the Petitioner agrees. *See* Doc. # 326 at 1–2.

**6.** The Petitioner also challenges the Ohio rule that ineffective assistance of counsel claims must be asserted on direct appeal, unless the same attorney represents a defendant both at trial and during an appeal. This Court deems it unnecessary to address the Petitioner's ar-

With respect to the first such prong, the Petitioner contends that deference should not be afforded to the state court findings, because he was not given an adequate opportunity to pursue post-conviction relief in state courts. As the Petitioner points out, the pre-amendment version of § 2254(d) expressly provided that the presumption of correctness was inapplicable in instances where factual disputes were not resolved in state court proceedings (§ 2254(d)(1)), where the material facts were not adequately developed at the state court hearing (§ 2254(d)(3)), where a petitioner did not receive a full, fair and adequate hearing in the state court proceeding (§ 2254(d)(6)), where a petitioner was otherwise denied due process in the state court proceeding (§ 2254(d)(7)), and where the state court factual findings are not fairly supported by the record (§ 2254(d)(8)). According to the Petitioner, all of these exceptions to the presumption of correctness are demonstrated by the fact that, in Hamilton County, the trial courts have denied every request for post-conviction relief, filed by an individual who has been sentenced to death, by merely signing findings of fact and conclusions of law prepared by the Hamilton County Prosecutor's office, a practice which was followed with regard to Petitioner's request for post-conviction relief. Moreover, he points out that the state courts denied him both the opportunity to conduct discovery and a hearing on the claims he raised in conjunction with his request for such relief.

As is indicated, this argument is directed at Judge Merz' recommendation that this Court hold that Petitioner has procedurally defaulted on 10 of his Claims by virtue of failing to raise these claims on direct appeal, causing these claims to be foreclosed by the Ohio doctrine of *res judicata.* With those 10 Claims, the Petitioner

asserted that his federal constitutional rights were violated by the introduction of character evidence relating to the victim during the guilt portion of his trial (Fifth Claim); by the use of his post-arrest silence to prove his guilt (Eighth Claim); by permitting members of the jury to view him during the trial, while he was in shackles (Tenth Claim); by an erroneous "acquittal first" instruction (Eleventh Claim); by improper voir dire (Twelfth Claim); by the prosecution's systematic use of peremptory challenges to exclude, from the jury, individuals who had expressed reservations about the death penalty (Thirteenth Claim); by permitting him to waive his right to present mitigating evidence, without first determining whether he was competent to do so (Fourteenth Claim); by the trial court considering a presentence report (Fifteenth Claim); by an erroneous reasonable doubt instruction (Sixteenth Claim); and by the use of an invalid death penalty specification (Twenty–Fifth Claim).

In *State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), the Ohio Supreme Court recognized the applicability of the doctrine of *res judicata* in proceedings under Ohio's post-conviction relief statute, holding in ¶ 9 of the syllabus:

9. Under the doctrine of *res judicata,* a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment.

The Hamilton County Court of Appeals applied *Perry* to conclude that Zuern could not proceed with the contentions which

guments in this regard, since Judge Merz resolved the Petitioner's Claims concerning the effectiveness of his trial and appellate counsel on their merits. This Court will do the same. Indeed, if the Respondent had

argued that Petitioner's ineffective assistance of counsel claims were procedurally barred, this Court would have rejected that argument. *See Combs v. Coyle,* 205 F.3d 269, (6th Cir. 2000).

form the basis of the 10 Claims in question in his petition for post-conviction relief. As can be seen from ¶ 9 of the syllabus of *Perry,* the only possible factual findings that the Hamilton County Court of Appeals could have made, on the issue of the applicability of the doctrine of *res judicata,* in Petitioner's appeal from the denial of his petition for post-conviction relief concern the question of whether the Petitioner *could* have raised any of the 10 above-listed Claims in his direct appeals. Courts in Ohio have held that a claim could have been raised, unless it is dependent upon evidence which is *dehors* the record. *See e.g., State v. Milanovich,* 42 Ohio St.2d 46, 325 N.E.2d 540 (1975); *State v. Sullivan,* 1999 WL 1249529 (Ohio App.1999). It is apparent that none of these Claims raises an issue which could not have been resolved by an ·examination of the record, and that, therefore, the state court findings concerning the applicability of *res judicata* were correct.

With the second prong of his broad attack, the Petitioner focuses upon the doctrine of procedural default, which can be traced to the decision by the United States Supreme Court in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Therein, the Supreme Court held that, in the absence of cause and prejudice, a District Court cannot grant a writ of habeas corpus, when the state courts have refused to address the merits of a federal constitutional argument, on the ground that the defendant failed to follow a state procedural requirement. In *Boyle v. Million,* 201 F.3d 711, 716 (6th Cir.2000), the Sixth Circuit noted that "[w]e have consistently held that, absent cause and prejudice, 'a federal habeas corpus petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review.' *Gravley v. Mills,* 87 F.3d 779, 784–85 (6th Cir.1996)." In *Carpenter v. Mohr,* 163 F.3d 938 (6th Cir. 1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999), the Sixth Circuit wrote:

Under *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986), the Sixth Circuit utilizes a four part analysis when a state argues that a federal habeas claim has been procedurally defaulted in state court. This court determines:

1) whether there is a procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to follow this rule; 2) whether the state courts actually enforced the state procedural rule; 3) whether the state procedural rule is an adequate and independent state ground to foreclose federal relief; and if so 4) the petitioner must establish cause for his failure to follow the rule and prejudice by the alleged constitutional error. *Id.*

*Id.* at 943 n. 10. *Accord, Reynolds v. Berry,* 146 F.3d 345, 347–48 (6th Cir.1998).

The Petitioner has not challenged Judge Merz' finding that the first prong of that test was met. Under that prong, there must be a state procedural rule that is applicable to the Petitioner's Claims, and he must have failed to follow that rule. Herein, such a rule does exist, to wit: the failure to raise an issue on direct appeal, resulting in the *Perry* rule of *res judicata* foreclosing the Petitioner from litigating that issue in his post-conviction proceeding. It is apparent that the Petitioner failed to follow that rule, since he did not raise the 10 Claims in question during his direct appeal. He does, however, argue that the second and third prongs of the Sixth Circuit's four-part test have *not* been met. In particular, the Petitioner contends that the *Perry* rule of *res judicata* is not actually enforced and, thus, is not an adequate and independent state ground, because, in death penalty cases, the Ohio Supreme Court has repeatedly addressed issues in instances where an objection was not made at trial or the issue was not presented in the intermediate court of appeals. Although the Petitioner has cited a number of decisions by the Ohio Supreme Court, in which it addressed issues under those circumstances, none of those deci-

sions involved an application of the Ohio rule of *res judicata* in a post-conviction proceeding. On the contrary, each of those decisions was a direct appeal from a conviction and sentence of death.[7] The Petitioner has not cited a single case in which an Ohio court has failed to apply *res judicata* and, thus, has permitted a defendant to raise an issue in a post-conviction proceeding which could have been raised on direct appeal. Moreover, in *Mapes, supra,* the Sixth Circuit rejected a similar argument. Therein, the petitioner had been convicted and sentenced to death. In his habeas corpus action in federal court, he alleged, *inter alia,* that the trial judge was biased against him. 171 F.3d at 420–21. He had not, however, raised that issue in his direct appeal from his conviction and sentence; rather, he raised it for the first time in a post-conviction proceeding in state court. The Ohio trial and appellate courts concluded that the judicial bias claim was barred by virtue of *Perry.* Before the Sixth Circuit, the petitioner argued that he should be permitted to present that claim in his federal habeas corpus proceeding, because Ohio courts do not regularly apply its procedural default rules. The petitioner also cited decisions in which Ohio courts addressed the merits of arguments, despite procedural defaults. The Sixth Circuit acknowledged that, in some instances, Ohio appellate courts have forgiven a procedural default (such as a failure to object at trial) and have addressed the merits of an assignment of error. 171 F.3d at 421. However, the *Mapes* court also noted that none of those cases involved a post-conviction proceeding and, further, that Ohio courts have consistently applied *Perry* to deny review of claims, in post-conviction proceedings, that were or could have been asserted on direct appeal. Since the petitioner had failed to present his claim concerning judicial bias on his direct appeal, he was precluded from doing so in his federal habeas corpus action in the absence of a showing of cause and prejudice. In accordance with *Mapes,* and pursuant to a review of the relevant Ohio law, this Court concludes that Ohio courts have consistently enforced *Perry* and the rule of *res judicata.* Given that the Petitioner merely contends that *Perry* and the rule of *res judicata* is not an adequate and independent state ground (the third prong), because it is not actually enforced, his argument with respect to the third prong of the test is without merit. Moreover, since the Sixth Circuit has repeatedly applied *Perry* and the rule of *res judicata* to preclude federal habeas review (*see e.g., Mapes* ), the rule is an adequate and independent state ground. Accordingly, this Court concludes that the second and third prongs of the Sixth Circuit's four-part test have been met.

■ The Court will address the fourth prong (i.e., whether the Petitioner has demonstrated cause and prejudice for his failure to follow the Ohio procedural rule), with respect to each of the 10 Claims on which Judge Merz recommended that the Court find procedural default. However, as a general overview to the resolution of that question, it should be noted that the Petitioner contends that he can establish cause and prejudice for each of those Claims, by the failure of his trial counsel to raise the particular issue during trial and/or the failure of his appellate counsel to raise that issue on his direct appeal. The Sixth Circuit has held that constitutionally ineffective assistance of counsel can establish cause. *See e.g., Lucas v. O'Dea,* 179 F.3d 412, 418 (6th Cir.1999); *Gravley v. Mills,* 87 F.3d 779, 785 (6th Cir.1996). It bears emphasis, however, that not every error by counsel can establish cause; rather, only representation that is constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104

---

7. The Petitioner has attached an appendix of decisions to his Objections (Doc. # 326) in which the Ohio Supreme Court addressed an issue when the defendant had failed to object at trial or to present the argument to the intermediate appellate court. None of those decisions involved a post-conviction proceeding.

S.Ct. 2052, 80 L.Ed.2d 674 (1984), can establish cause. *See Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).[8] Under *Strickland,* a claim of ineffective assistance of counsel is comprised of two elements, to wit: that the representation afforded by counsel was deficient and that the deficient representation prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052. Consequently, when a habeas petitioner contends that he can establish cause and prejudice to excuse his procedural default, by virtue of his counsel's ineffective assistance, the cause and prejudice prongs are conflated, since prejudice is one of the elements of a claim of ineffective assistance. In other words, if the Petitioner can establish cause, because his counsel were ineffective under *Strickland,* he has also established prejudice.

Accordingly, the Court rejects the Petitioner's two broad attacks on Judge Merz' Initial Report and Recommendations.

### B. First and Second Claims

■ With his First Claim, the Petitioner argues that his conviction for aggravated murder and resulting sentence of death violated the Eighth and Fourteenth Amendments, because he is not guilty of that offense. In particular, Zuern contends that post-trial evidence has established that he did not act with prior calculation and design. With his Second Claim, the Petitioner contends that his conviction and death sentence were obtained in violation of the Due Process Clause of the Fourteenth Amendment, because the evidence which was introduced during his trial failed to establish that he acted with

prior calculation and design. Since both of these Claims challenge the sufficiency of the evidence to establish the element of prior calculation and design, this Court will address the two claims together.

Ohio Revised Code § 2903.01(A) defines aggravated murder as purposefully causing the death of another, with prior calculation and design. Murder is defined as purposefully causing the death of another. Ohio Rev.Code § 2903.02(A). Only those individuals convicted of aggravated murder are eligible for the death penalty. *See* Ohio Rev.Code § 2929.02. Thus, the element of prior calculation and design was necessary, not only to convict Zuern for aggravated murder but also to impose the death penalty upon him.

In *Johnson v. Coyle,* 200 F.3d 987, 991 (6th Cir.2000), the Sixth Circuit restated the familiar test by which claims challenging the sufficiency of the evidence are to be analyzed in habeas corpus proceedings:

> When a defendant challenges the sufficiency of the evidence to support a conviction, we inquire "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir.1990) (*en banc*); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

As an initial matter, it cannot be questioned that Petitioner committed the offense of murder. The evidence was uncontradicted that Petitioner purposefully caused the death of Pence by stabbing him

---

**8.** *Murray* is particularly instructive. Therein, the petitioner had argued that the inadvertence of his appellate counsel in failing to raise certain claims on direct appeal constituted cause, permitting federal habeas review of those claims. The Supreme Court rejected that assertion, writing "[s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective under

the standard established in *Strickland v. Washington,* we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." 477 U.S. at 488, 106 S.Ct. 2639. In short, one does not establish cause merely by setting out counsel's failure to raise a particular issue at a given stage of the proceedings.

in the heart with a shank.[9] During his closing argument, Petitioner's counsel did not contest that his client had taken the life of Pence. Rather, the Petitioner's defense centered on the assertion that he had not acted with prior calculation and design. The evidence of that element was not overwhelming. For instance, there was no evidence that Zuern and Pence had interacted in any manner before the murder occurred. Thus, Zuern could not have formed a prior calculation and design to kill Pence, as opposed to some other corrections officer,[10] before that officer arrived in front of the Petitioner's cell. Nevertheless, reviewing the evidence presented at the Petitioner's trial in the manner most favorable to the prosecution, this Court concludes that a reasonable jury could have found that the Petitioner acted with prior calculation and design, as that element has been defined by the Ohio courts. In *State v. Taylor,* 78 Ohio St.3d 15, 676 N.E.2d 82, *cert. denied,* 522 U.S. 851, 118 S.Ct. 143, 139 L.Ed.2d 90 (1997), the Ohio Supreme Court elaborated upon the meaning of the phrase "prior calculation and design:"

In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, at paragraph one of the syllabus, we agreed that " 'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law." The General Assembly's apparent intention "was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *Id.,* 56 Ohio St.2d at 11, 10 O.O.3d at 6, 381 N.E.2d

at 193. Also, in *Cotton,* at paragraph two of the syllabus, we held that "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.' "

In *State v. Jenkins,* 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828, the court of appeals found three factors important in determining whether prior calculation and design exists: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events"?

*Id.* 19, 676 N.E.2d at 89. The Ohio Supreme Court also cautioned that "it is not possible to draw a bright-line that emphatically distinguishes between the presence or absence of 'prior calculation and design' " and that "each case turns on the particular facts and evidence presented at trial." *Id.* at 20, 676 N.E.2d at 89. *See also, State v. Goodwin,* 84 Ohio St.3d 331, 343–44, 703 N.E.2d 1251, 1263, *cert. denied,* —— U.S. ——, 120 S.Ct. 118, 145 L.Ed.2d 100 (1999).

With that review of the law, this Court turns to the evidence of prior calculation and design that was presented during the Petitioner's trial. Wayne Lewis ("Lewis"), a fellow inmate of Zuern at the CCI, testified on behalf of the prosecution that he had observed the Petitioner sharpening a piece of metal into a shank or knife. Doc. # 98 at 854–55. Lewis also testified that, on another occasion, the Petitioner had indicated that somebody ought to do something to the guards, because they did not permit prisoners to use all of their allotted

---

**9.** The evidence that Zuern murdered Pence was so uncontradicted that, had the Petitioner been involved in a civil case rather than in a criminal prosecution, the trial court could quite properly have entered summary judgment against the Petitioner.

**10.** At the Petitioner's trial, the court instructed the jury that prior calculation and design

could exist where a defendant plans to kill any member of a certain class of persons, even though he did not know in advance who the particular victim would be. *See* Doc. # 99 at 1128. The Petitioner has not challenged that statement of Ohio law in either the courts of Ohio or before this Court.

time on telephone calls. *Id.* at 853–54. In addition, another fellow inmate of the Petitioner, Gerald Steven Joseph ("Joseph"), testified about his conversations with the Petitioner, after Pence had been murdered. Joseph indicated that the Petitioner told him that he got his "nut" from killing. *Id.* at 864. Joseph also testified that the Petitioner had told him that he (Zuern) had been told by another inmate that his cell would be searched on the evening that Pence was killed. *Id.* at 865. According to Joseph's description of his conversation with the Petitioner, Zuern, after having been warned about the planned search, got out of his bed, put on his pants and waited for the guards to reach his cell. *Id.* at 866. When his cell door had been partially opened, Petitioner lunged with his shank and used his shoulder to exert additional pressure and make the shank enter Pence's body more deeply. *Id.* In addition, Burton, who along with Pence had attempted to search Petitioner's cell on the evening of June 9th, testified that, when the officers arrived at the cell, Pence stood in front of the cell door and directed Zuern to come to the door and to stand in front of it. *Id.* at 935. Petitioner complied. *Id.* Pence then told Zuern to come outside the door and to put his hands against the wall. *Id.* When the cell door was opened, Zuern lunged at Pence, and stabbed that officer in the chest with his shank. *Id.* at 935–37.

The foregoing evidence convinces this Court, after viewing the evidence in the light most favorable to the prosecution, that a rational jury could have found that the state proved beyond a reasonable doubt that the Petitioner acted with prior calculation and design. Applying the three factors to which the Ohio Supreme Court referred in *Taylor, supra,* supports that conclusion. Although the Petitioner did not know Pence, he was familiar with other guards, and there was evidence that his relationship with the guards was strained. Moreover, Judge Morrissey instructed the jury that prior calculation and design could exist where a defendant plans

to kill a member of a class of persons, rather than a particular person within that class. *See* Doc. # 99 at 1128. There was also evidence that the Petitioner gave thought and preparation to the selection of his weapon, by sharpening a piece of metal into a shank. Finally, although the act occurred quickly, there was evidence that it was not an instantaneous eruption of events. Joseph's testimony concerning his conversations with the Petitioner could have convinced the jury of that fact. In addition, Burton's testimony, to the effect that the Petitioner complied with Pence's initial command to approach the cell door and to stand in front of it, also supports a finding that the Petitioner's acts were not an instantaneous eruption of events.

With respect to the Petitioner's contention that newly discovered evidence establishes that he is innocent of the offense for which he was convicted (because that evidence establishes that he did not act with prior calculation and design), the Supreme Court has recognized that claims of actual innocence, predicated upon newly discovered evidence, "have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings." *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Therefore, the Petitioner's mere assertion that such evidence establishes his innocence is not cognizable in this proceeding.

Accordingly, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, as those Objections relate to the Petitioner's First and Second Claims.

### C. Third Claim

With this Claim, the Petitioner contends that the state violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, by withholding favorable and impeach-

ing evidence from him. In particular, Zuern focuses upon three matters, to wit: a memorandum drafted by Deputy Kenneth Schweinefuss ("Schweinefuss Memorandum"), a statement that Wayne Lewis gave to officers at 1:43 a.m., on June 10, 1984, and evidence that could have been employed to impeach Lewis, a prosecution witness. Judge Merz recommended that this Court deny this Claim on its merits. As a means of analysis, this Court will briefly review the jurisprudence pertaining to *Brady* and its progeny, following which it will address the three matters in the above order, discussing together the Schweinefuss Memorandum and Lewis' statement.

As the Sixth Circuit has noted, *Brady* did not create a general constitutional right to discovery in criminal case; rather, the rule established therein "is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir.1994). *Brady* imposes upon the government "an obligation 'to turn over evidence in its possession that is both favorable to the accused and *material to guilt* ....'" *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir.1991) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)) (emphasis supplied by the Sixth Circuit). In *Schledwitz v. United States*, 169 F.3d 1003 (6th Cir. 1998), the Sixth Circuit elaborated upon the materiality requirement of *Brady:*

> When the defendant, as in this case, asserts that the newly discovered *Brady* evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was "material." *United States v. Frost*, 125 F.3d 346, 382 (6th Cir.1997). In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court clarified the "materiality" analysis. The Court explained that a showing

of materiality does not require the suppressed evidence in question establish the defendant's innocence by a preponderance of the evidence. Rather, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555; *Frost,* 125 F.3d at 382–83. Nor does the defendant need to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555; *United States v. Smith,* 77 F.3d 511, 515 (D.C.Cir.1996) (materiality requirement is not a sufficiency-of-the-evidence test).

> Instead, any favorable evidence, regardless of whether the defendant has made a request for such evidence, is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *Frost,* 125 F.3d at 382. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375; *United States v. Presser,* 844 F.2d 1275, 1281 (6th Cir.1988). Moreover, in determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the "reasonable probability" test is met. *Kyles,* 514 U.S. at 436, 115 S.Ct. 1555; *Frost,* 125 F.3d at 383.

*Id.* at 1011–12. In addition, "*Brady* recognizes no distinction between evidence which serves to impeach a government witness' credibility and evidence which is directly exculpatory of the defendant.

Both are 'evidence favorable to the accused' and must be disclosed." *Mullins*, 22 F.3d at 1372. *See also Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady* ]"). The Sixth Circuit has said that "[n]o *Brady* violation exists where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.'" *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.), *cert. denied*, 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991) (quoting *United States v. Grossman*, 843 F.2d 78, 85 (2nd Cir.1988), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989)). *See also, Mullins*, 22 F.3d at 1371–72 ("*Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial"); *United States v. Todd*, 920 F.2d 399, 405 (6th Cir.1990). Moreover, the Sixth Circuit has indicated that there is no violation of *Brady*, unless the undisclosed materials would have led directly to the discovery of admissible evidence. *Phillip*, 948 F.2d at 249–50.

■ The Schweinefuss Memorandum was drafted June 10, 1994, the day after Petitioner had killed Pence. Therein, Deputy Schweinefuss relates a conversation between himself and Loyal Hearst ("Hearst"), an inmate at the CCI, and what he did in reaction to that conversation:

> On [William Zuern], at or between the hours of 1330 and 1400, I was on the second range of A–Block when inmate Loyal Hearst called me to his cell and stated that he and William Zuern had an

argument on 6–8–84 and that Zuern stated he was going to kill him the first chance he got. Inmate Hearst stated that Zuern had in his possession a homemade knife which he had sharpened on his cell floor.

> I then walked to the A–Block rec. area and informed Deputy Fowler of the situation and we decided to bring the matter to the attention of the second shift supervisor Deputy [Supervisor–I] Menkhaus.

> Upon our belief, at approximately 1450 hrs., Deputy Fowler and myself informed [Supervisor–I] Menkhaus of the situation and he stated that he would conduct a shakedown to try and find the weapon. This statement is true and accurate to the best of my knowledge.

> This incident occurred on 6–9–84.

Doc. # 90 at Ex. O.

Schweinefuss, whom the prosecution called as a witness at the Petitioner's trial, testified that an inmate (whom he did not identify) had told him that the Petitioner had a knife. He also testified how he responded, after having been informed of that fact. However, he did not tell the jury, during his direct examination, that Hearst had mentioned that the Petitioner had threatened to kill him (Hearst), and that he had memorialized this conversation in a memorandum. The sole contested issue at Zuern's trial was whether he had acted with prior calculation and design when he had killed Pence, a corrections officer.[11] It is apparent that presenting evidence that Zuern had threatened to kill another inmate could have cast doubt upon the prosecution's theory that he had acted with prior calculation and design, with respect to Pence or the class of guards to which Pence belonged, as a whole. *See* Footnote 10, *supra.* Moreover, since the

---

11. Petitioner has never challenged the fact that he killed Pence. Indeed, his counsel conceded as much during his closing argument at the guilt phase of the Petitioner's trial. *See* Doc.# 99 at 1092 (indicating that the only question before the jury was whether Zuern had acted with prior calculation and design and, thus, was guilty of aggravated murder, as opposed to being guilty of murder). Moreover, there was eyewitness testimony from Burton and other corrections officers who saw the Petitioner stab Pence.

Petitioner had not been provided information concerning this conversation with Hearst and a copy of the Schweinefuss Memorandum, which set out this conversation, his counsel did not cross-examine the Deputy on that subject. In his statement, which was recorded and has been transcribed,[12] Lewis indicated that Hearst had told him that Zuern had threatened to kill him.[13] Nevertheless, the state argues that the failure to furnish the Schweinefuss Memorandum and Lewis' statement did not violate *Brady,* because the Petitioner "knew or should have known the essential facts permitting him to take advantage of any exculpatory information." *Clark,* 928 F.2d at 738 (internal quotation marks and citation omitted). Indeed, Judge Merz rejected the Petitioner's assertion that the state had violated its obligations under *Brady,* in part, because his counsel could have easily discovered the fact that he had threatened Hearst from their client. As stated above, the prosecution did not violate *Brady,* unless the document or the statement was "material." The Magistrate Judge concluded that the Schweinefuss Memorandum and Lewis' statement were not material, since it was possible that the Petitioner had made the knife for more than one purpose. As a means of analysis, the Court will initially address the issue of whether the Petitioner knew or should have known the essential facts contained in the Schweinefuss Memorandum and Lewis' statement, so that he could take advantage of any exculpatory information. In the event that the Court rejects the Respondent's contention that there was no violation of *Brady,* because Petitioner knew the essential facts necessary to permit him to take advantage of the exculpatory information contained in the Schweinefuss Memorandum and in Lewis' statement, the Court will decide whether that withheld information was "material."

Unquestionably, as the Magistrate Judge found and the state argues, assuming the truth of the Schweinefuss Memorandum, the Petitioner knew of the ongoing feud at the CCI between himself and Hearst and of the fact that he had threatened to kill Hearst. That said, however, there is no indication that Petitioner knew that Hearst had informed officers of the existence of that feud or threat. Therefore, it cannot be doubted that the Schweinefuss Memorandum contained some information of which the Petitioner was not aware (i.e., that corrections officers had been informed of the existence of the feud and threat). Moreover, there is no indication that the Petitioner knew that Lewis had provided the same information to authorities, only hours after Pence had been killed. Given that the Petitioner was aware of the feud between himself and Hearst, this Court must decide whether the fact that the information concerning those matters was contained within a document written by a corrections officer and in a recorded statement given to officers is an essential fact that was not available to him, which would have permitted him to take advantage of the exculpatory information in that document and statement. To decide that question, the Court must examine the purpose to which Petitioner could have put that document and statement, if they had been provided to him for use at trial.

The Petitioner could have used the Schweinefuss Memorandum to cross-examine its author. It will be remembered that Schweinefuss testified that an inmate (Hearst, whom he did not identify) had told him that Zuern had a weapon. That testimony was introduced for the purpose of explaining why the subsequent search of the Petitioner's cell occurred, rather than

---

12. The transcript of Lewis' statement was Petitioner's Exhibit 2, at the hearing conducted before Judge Merz.

13. Lewis testified at Petitioner's trial; however, the defense did not attempt to cross-examine him on his statement to officers, because they had not been provided with a transcription of same.

for the truth of the matter asserted. Therefore, Schweinefuss' testimony in that regard was not hearsay. *See* Ohio R. Evid. 801(C). *See also, State v. Thomas,* 61 Ohio St.2d 223, 231, 400 N.E.2d 401, 407 (1980). Similarly, Petitioner's counsel could have cross-examined Schweinefuss about the entirety of Hearst's statements (i.e., that the inmate also indicated that Zuern had threatened to kill him), in order to provide an complete explanation as to why it was decided to search the Petitioner's cell. Therefore, if Petitioner had been provided the Schweinefuss Memorandum, he could have ensured that its contents were presented to the jury by way of cross-examining its author.[14]

Additionally, production of the Schweinefuss Memorandum could have made it possible for Petitioner's counsel to call Hearst to testify. Although Petitioner knew that he had threatened Hearst, he was not aware that Hearst had so informed the authorities and that his disclosure had been incorporated into an official document. Without having been provided that document, calling Hearst to testify would have posed a grave danger to Petitioner and his counsel. Zuern had threatened to kill Hearst, and the latter, an inmate at the CCI, would obtain no benefit by providing testimony that might be favorable to an individual who had killed a guard at that facility. Thus, Hearst could not have been perceived as a potentially favorable witness to the defense. However, armed with the Schweinefuss Memorandum, Petitioner's counsel could have avoided some of the dangers posed by calling Hearst. In particular, that document would have permitted Petitioner to call Hearst as a witness and to impeach him, if he had denied that Zuern had threatened him, or to refresh his recollection, if Hearst had said he did not remember the incident. Indeed, the information

therein might have caused the trial court to permit Zuern to treat Hearst as a hostile witness. Therefore, disclosure of the Schweinefuss Memorandum would have made it far less dangerous and, thus, more advantageous for Zuern to call Hearst as a witness to testify to evidence that might have cast doubt on the presence of prior calculation and design to kill a corrections officer. In addition, disclosure of Lewis' statement would have made it even more advantageous for Petitioner to call Hearst, since that statement could have provided a second source with which to impeach Hearst.

In addition, it is possible that the Schweinefuss Memorandum, itself, could have been introduced as evidence during Petitioner's trial, as evidence of the *truth* of the statements contained therein, under exceptions to the hearsay rule. At trial, Petitioner could have argued that the document was admissible pursuant to Rule 803(8) of the Ohio Rules of Evidence, which provides:

> (8) *Public records and reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

That Rule differs from Fed.R.Evid. 803(8), in that Ohio permits a criminal defendant to introduce police reports, while the federal rule prohibits the introduction such reports in criminal prosecutions.[15] If

---

14. Given that the pertinent portion of Lewis' statement merely relates what he had been told by Hearst, it is doubtful that Petitioner could have used that statement to cross-examine Lewis.

15. The Committee Notes to Ohio Rule 803(8) state that it was varied from the federal version "to make clear that police reports favorable to the defendant could be offered by him in a criminal case."

Zuern had attempted to introduce the Schweinefuss Memorandum, the prosecution might have objected on the basis that the statements attributed to Hearst therein constitute hearsay within hearsay. *See* Ohio R. Evid. 805. Courts in Ohio have indicated that, for the entirety of a police report to be admitted under Rule 803(8), all of the persons contributing information to the report must be under "a duty to report," unless some other exception to the hearsay rule is applicable. *See e.g., State v. Gibson,* 1999 WL 74532 (Ohio App.1999); *State v. Settles,* 1998 WL 667635 (Ohio App.1998). For instance, in *Settles,* the court indicated that, although police reports are generally admissible, the statements by witnesses to a crime, contained in such a report, could not be admitted, pursuant to Rule 803(8), since such witnesses are not under an official duty to make statements to police officers conducting an investigation. Similarly, there is no indication that Hearst, the witness, was under a duty to report that Zuern had threatened to kill him. Therefore, the Court will assume that the statements attributed to Hearst in the Schweinefuss Memorandum would not have been admissible under Rule 803(8), unless some other exception to the hearsay rule is applicable. However, by refusing to produce the Schweinefuss Memorandum to the Petitioner, the state denied to the Petitioner the opportunity of arguing that another exception to the hearsay rule was applicable to the statements attributed to Hearst in that document. In particular, the Petitioner was denied the opportunity to argue that Hearst's statements constituted an excited utterance. *See* Ohio R. Evid. 803(2). On June 9, 1984, Hearst informed Schweinefuss that Zuern had threatened to kill him on June 8, 1984. However, the Ohio Supreme Court has held:

> There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought. Therefore the passage of time between the statement and the event is relevant but not dispositive of the question.

*State v. Taylor,* 66 Ohio St.3d 295, 303, 612 N.E.2d 316, 322 (1993) (emphasis in the original). When threatened by Zuern, Hearst was an inmate at the CCI, who was without means of escaping from the danger posed by Zuern. Therefore, the stress of the threat from Zuern (an individual who was being held in the CCI on a murder charge) would not have been likely to dissipate quickly, and the passage of one day might not have meant that Hearst' statements to Schweinefuss were the result of reflective thought. Therefore, if Petitioner had been provided the Schweinefuss Memorandum, he would have had the opportunity to move and to argue for its introduction at his trial, an opportunity that was denied him by the prosecution's failure to disclose that document.[16]

While it is always difficult to devise trial strategy in objective fashion after the fact, knowledge of the Schweinefuss Memorandum (and, for that matter, of the statement that Lewis had given to the law enforcement officials) might have emboldened Zuern's counsel to call him to the stand, to testify in his own defense at trial that his anger was directed not to a nameless class of guards but to Hearst, secure in the knowledge that the Memorandum could have been utilized, along with more thorough cross-examination of Hearst, to rebut what undoubtedly would have been the prosecution's claim that his testimony of no animus toward the guards was a recent fabrication. For that matter, had Hearst admitted the feud with Zuern and Zuern's threat to kill him, if a proper foundation had been laid, the Schweinefuss Memorandum might well have been admis-

---

16. The Petitioner has not suggested, nor can this Court conceive of, a manner in which Lewis' statement would have been independently admissible at Zuern's trial.

sible, for the truth of the statements by Hearst contained within that document, as a prior consistent statement of Hearst, to rebut the State's express or implied charge of recent fabrication. Such a statement would be specifically defined as non-hearsay. Ohio Evid. R. 801(D)(1)(b). Of course, that none of these hypothetical scenarios actually transpired at Petitioner's trial can be directly attributable to the fact that his counsel had no knowledge of the existence of the Schweinefuss Memorandum or of Hearst's statements therein.

Accordingly, this Court concludes that the disclosure of the Schweinefuss Memorandum would have led to the discovery of admissible evidence, would have been useful as an impeachment tool, and, under certain circumstances, might have been admissible in evidence for the truth of the statements contained therein, either by way of an exception to the hearsay rule or to rebut the State's claim of recent fabrication by Hearst. For that matter, disclosure of the Memorandum might have allowed Zuern to testify, secure in the knowledge that the document would have provided corroboration on the defense of lack of prior calculation and design to murder a guard.

Based upon the foregoing, the Court rejects the Respondent's contention that there was no violation of *Brady*, because Petitioner knew the essential facts necessary to permit him to take advantage of the exculpatory information contained in the Schweinefuss Memorandum. While Petitioner clearly knew the information contained within that memorandum, he did not know that the information had been included within a memorandum. It is the memorialization of facts within the memorandum that was non-disclosed *and* un-

known to Zuern.[17] The Court now turns to the question of whether the information contained within that document was "material."

As is indicated, evidence is material under *Brady*, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Schledwitz*, 169 F.3d at 1012. A reasonable probability is one that is sufficient to undermine confidence in the outcome of a trial. *Id.* The Petitioner argues that the information contained in the Schweinefuss Memorandum was material, because it could have been used to negate the element of prior calculation and design, by showing that he had manufactured a shank in order to do harm to Hearst, rather than to a guard. This Court agrees. Above, this Court has indicated that the evidence that Petitioner acted with prior calculation and design was, to say the least, not overwhelming. Therefore, the importance of any evidence that would tend to detract from the existence of that fact would tend to be magnified. The information contained in the Schweinefuss Memorandum would certainly have detracted from the existence of prior calculation and design. Thus, such evidence would have been relevant and admissible under Ohio law, since it would have made it less likely that Zuern had acted with prior calculation and design. *See* Ohio R. Evid. 401 (defining relevant evidence to include evidence that has a tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). There was no evidence that Zuern had ever come into contact with Pence, before the night in question. However, the trial

**17.** Given that the only possible use of Lewis' statement would be to have made it easier to impeach Hearst, if he had denied that Zuern had threatened him, the Court will not find that the failure to disclose that statement, alone, constituted a violation of *Brady*. However, since this Court must consider the non-disclosed evidence collectively (*Schledwitz*,

*supra*), the conclusion that the failure to disclose the Schweinefuss Memorandum constituted a violation of *Brady* (if the information contained therein was material) is reinforced by the non-disclosure of Lewis' statement, since that statement could have assisted in impeaching Hearst if he were to deny that Zuern had threatened to kill him.

court instructed the jury that it could find that prior calculation and design exists, where a defendant plans to kill any member of a certain class of persons, even though he did not know in advance the identity of the particular victim. In closing argument, the prosecution asserted, *inter alia*, that the jury could find prior calculation and design from the very fact that Zuern had taken time to manufacture his weapon. Doc. # 99 at 1087–88. Evidence that Zuern had threatened to kill Hearst, someone who was not in the same class of persons as Pence, would have weakened the state's theory that Zuern's act of sharpening a piece of metal evidenced his prior calculation and design to kill a guard.[18] This Court cannot disagree with Judge Merz that it is possible that Zuern made his weapon for more than one purpose; however, given the paucity of evidence concerning prior calculation and design, this Court nevertheless believes that there is a reasonable probability that the result of Petitioner's trial would have been different (i.e., he would have been convicted of murder rather than of aggravated murder), if the prosecution had disclosed the Schweinefuss Memorandum. In other words, the failure to provide that document has undermined confidence in the outcome of that trial.[19]

In sum, the Court disagrees with Judge Merz' recommendation that the Court reject the Petitioner's Claim that the prosecution violated its obligations under *Brady* by failing to produce the Schweinefuss Memorandum. Accordingly, the Court sustains the Petitioner's Objections to that judicial officer's Initial and Supplemental Reports and Recommendations, as those Objections relate to the non-disclosure of that memorandum.

Lewis was an inmate at the CCI, at the time that Pence was killed. He was the only witness who provided testimony that, prior to the killing of Pence, Zuern had expressed animus toward the guards. Thus, his testimony was important in establishing prior calculation and design. Petitioner contends that the state failed to provide evidence that could have impeached Lewis' testimony. In particular, Petitioner points out that, two months before Pence was killed, Lewis' probation had been revoked and he had been sentenced to a term of one to ten years. Within a matter of days after having testified for the state at Zuern's trial, the state filed a motion to mitigate Lewis' sentence. Shortly thereafter, the judge who had sentenced Lewis suspended further execution of that sentence. According to Zuern, the temporal proximity between Lewis' testimony and the suspension of his sentence demonstrates that Lewis provided that testimony pursuant to an agreement with the prosecution. Petitioner contends that evidence of such an agreement should have been disclosed. Judge Merz rejected that argument, concluding that there was no evidence that Lewis testified in exchange for his sentence being suspended. For reasons which follow, this Court agrees with Judge Merz' analysis.

■ Despite being permitted to engage in discovery on this point and the fact

---

18. This evidence became all the more important to the defense, after Lewis had blurted out that Zuern was crazy, that he was being incarcerated for murder and that he would not hesitate to kill again. The ability of the defense to show that Zuern wanted to kill someone other than a guard could have lessened any prejudicial effect of Lewis' remark.

19. One might argue that the prosecution should not be responsible for anticipating what a defendant's defense will be. In other words, in the absence of an indication that Zuern was defending on the basis that he had not acted with prior calculation and design, the prosecution could not have foreseen that the Schweinefuss Memorandum was exculpatory. This Court would reject such an argument. One of the elements of the offense with which the Petitioner was charged was that he had acted with prior calculation and design. The Schweinefuss Memorandum clearly cast doubt on that fact; therefore, the prosecution was aware of its exculpatory nature, even if the Petitioner had not stated that he would be defending on that basis.

that Judge Merz conducted an evidentiary hearing in this matter, the Petitioner has failed to present any testimony or documentary evidence to support his proposition that Lewis testified pursuant to an agreement with the prosecution. On the contrary, Thomas Logano, the assistant prosecutor who met with Lewis prior to his testimony and who conducted the direct examination of that witness, testified during the evidentiary hearing before Judge Merz that no promises or agreements were made with Lewis, other than, if anyone asked, the prosecutor would indicate that he had testified. III Tr. at 393. Of course, the state's obligation under *Brady* is not limited to instances where it has entered into an express agreement with one of its witnesses. For instance, in *Alderman v. Zant*, 22 F.3d 1541, 1554 (11th Cir.), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994), the Eleventh Circuit noted that the duty of disclosure extends to "informal understandings," as well as to instances where the prosecutor has made an express promise to a witness. However, the existence of an agreement, whether informal or express, remains a predicate for the prosecution's duty to disclose. In *Alderman*, the Eleventh Circuit concluded that the state had not violated *Brady*, by failing to disclose that a witness had testified in exchange for an agreement not to seek the death penalty, since there was no evidence of such an agreement. *See Id.* at 1555 ("Where there is, in fact, no agreement, there is no duty to disclose"). *See also, Mastrian v. McManus*, 554 F.2d 813, 823–24 (8th Cir.1977) (declining to read *Giglio* as requiring disclosure of a witness's expectation of leniency in exchange for testimony, in the absence of evidence of an express or implied agreement). Since this Court is unable to find that the state ex-

pressly or impliedly agreed to provide lenient treatment to Lewis, in exchange for his testimony, it concludes that there was no duty of disclosure under *Brady*.[20]

Nevertheless, in his Objections, Petitioner takes aim at Judge Merz's conclusion that an agreement between Lewis and the prosecutor, concerning the testimony of the former, did not exist. That conclusion supported the Magistrate Judge's recommendations concerning this Claim and the Petitioner's Fourth Claim (to the extent that those Claims are predicted upon the failure to disclose an agreement between the prosecution and Lewis). That judicial officer rejected the Petitioner's assertion that, given the temporal proximity between Lewis' testimony and the suspension of the execution of his sentence, there must have been a deal, and that it was not plausible that Lewis' testimony occurred without an agreement or promise. In rejecting that contention, Judge Merz concluded that, given Lewis' experience with the criminal justice system, he would have had an expectation that favorable testimony would result in his being rewarded by the prosecution. However, such an expectation does not establish that such testimony was the product of having been explicitly promised anything. The Petitioner contends that the foregoing reasoning "countenances the formation of *agreements* between witnesses and the State, based on winks and nods, implicit understandings, soft words of hope imparted from the State to the witness that never set [in] concrete terms...." Doc. #326 at 35 (emphasis added). The key word in that passage is agreement. Since the evidence fails to establish that an agreement between Lewis and the prosecution existed, there was no duty of disclosure.[21] *Alderman, supra.*

---

**20.** The Petitioner argues quite persuasively that the failure to disclose such an agreement would have constituted a violation of *Brady*. This Court cannot disagree with that argument; however, since the Petitioner has failed

to demonstrate that such an agreement existed, there was nothing to disclose.

**21.** In the absence of an agreement, which the prosecution would have been obligated to disclose, Petitioner's counsel could have attempt-

Accordingly, the Court sustains in part and overrules in part Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, as those Objections relate to the Petitioner's Third Claim. Those Objections are sustained as they relate to the Schweinefuss Memorandum and are otherwise overruled.

## D. Fourth Claim

With this Claim, Petitioner asserts that his conviction was obtained in violation of the Due Process Clause of the Fourteenth Amendment, because Lewis perjured himself. In *United States v. Frost,* 125 F.3d 346 (6th Cir.1997), *cert. denied,* 525 U.S. 810, 119 S.Ct. 40, 142 L.Ed.2d 32 (1998), the Sixth Circuit wrote that a *"Brady* claim may arise when the government has introduced trial testimony which was known to be, or should have been recognized as, perjury." *Id.* at 872. This Claim is predicated upon Zuern's contention that Lewis perjured himself when he indicated that he was not testifying pursuant to any type of agreement with the prosecution.[22] In particular, Lewis testified on direct examination that no threats, promises or deals had been made by law enforcement officers, in exchange for his testimony. Doc. # 98 at 848. Judge Merz recommended that this Court deny this Claim on the merits, for the reason that the evidence did not establish the existence of

such an agreement. Since the evidence failed to demonstrate the existence of an agreement between the prosecution and Lewis, pertaining to his testimony, this Court agrees that Petitioner's conviction was not obtained with the use of perjured testimony.

Accordingly, the Court overrules Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, as those Objections relate to the Petitioner's Fourth Claim.

## E. Fifth Claim

With his Fifth Claim, Zuern asserts that he was denied a fair trial, as guaranteed by the Due Process Clause of the Fourteenth Amendment, by the prosecution's introduction of evidence and use of argument concerning Pence's good character, during the guilt phase of his trial. The Magistrate Judge recommended that the Court dismiss this claim, since it was procedurally defaulted. The Court begins its analysis by reviewing the allegedly unconstitutional evidence and argument.

Very early in his opening statement in the guilt phase of the trial, the prosecutor told the jury that the evidence would demonstrate that Pence was 25–26 years of age, that he was the sole support of his widowed mother, where he had attended school, that he was well-liked and conscientious about his job and that he was re-

---

ed to impeach Lewis, by asking him whether he hoped to get a benefit from testimony favorable to the prosecution. However, nothing prevented Petitioner's counsel from conducting such a cross-examination of Lewis.

**22.** Petitioner also argues that Lewis committed perjury by minimizing his criminal record during his trial testimony. Lewis testified that he was incarcerated in the CCI for three theft cases, drug abuse and a sentence to the penitentiary of one to ten years. Doc. # 98 at 848. In addition, he indicated that his criminal record included convictions for one count of felonious assault, one count of drug abuse and three counts of theft. *Id.* Petitioner contends that Lewis neglected to include a conviction for illegally processing a drug document. Assuming for present purposes that

the prosecution knew or should have known that Lewis perjured himself by not including that conviction in his description of his criminal record, this Court cannot conclude that such an assumption entitles the Petitioner to relief. It is axiomatic that the use of perjured testimony to obtain a conviction is the basis for a new trial, only if "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Frost,* 125 F.3d at 382 n. 17 (citation and internal quotation marks omitted). Given that Lewis told the jury that he had five convictions on his record and that he was serving a term of incarceration of from one to ten years, there is no reasonable likelihood that testimony concerning an additional conviction would have affected the judgment of the jury.

spected by his community, family and fellow officers. *See* Doc. # 98 at 836–37.[23] During the guilt phase of the trial, Lincoln Stokes ("Stokes"), the Hamilton County Sheriff, was permitted to testify about Pence's background, over·the objection of Petitioner's counsel.[24] Doc. # 98 at 993–94. In particular, Stokes testified about Pence's educational background and that he was a conscientious employee, who was unmarried and devoted to his mother. *Id.* During his closing argument, Zuern's counsel reviewed the testimony that had been presented by the various witnesses, including Stokes, whom Zuern's counsel indicated had been called merely to present a "eulogy." In response, the prosecutor, during the rebuttal portion of his closing argument in the guilt phase, indicated that Stokes had been called as a witness to tell the jury something about Pence, that he was the sole support of his widowed mother and that he was an educated man. Doc. # 99 at 1109. The prosecutor also told the jury, during the rebuttal portion of his closing argument, that Pence's mother and other family members cared that a police officer had been killed by someone who was incarcerated. *Id.* at 1114. In addition, in response to the argument by Petitioner's counsel that his client had committed a simple murder, the prosecutor told the jury not to tell that to Pence's mother. *Id.* at 1119.

Judge Merz found that this claim was procedurally barred by Petitioner's failure to raise it on direct appeal and the *res judicata* rule of *Perry*. Petitioner disagrees, arguing that he can establish cause

and prejudice, by virtue of the ineffective assistance of his appellate counsel, their failure to raise this issue on direct appeal. To establish a claim of ineffective assistance of counsel, a petitioner must demonstrate both that the representation afforded by counsel was deficient and that said deficient representation prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. For present purposes, this Court will assume that appellate counsel's failure to raise the issue on direct appeal could be classified as performance that is deficient. However, for reasons which follow, this Court concludes that he was not denied a fair trial by the foregoing evidence and argument. Therefore, Petitioner cannot establish the prejudice element of the *Strickland* test, and he has failed to establish cause and prejudice.

As an initial matter, this Court will assume that the introduction of the evidence in question and the argument was improper under the law of Ohio.[25] Under the law of Ohio, only relevant evidence is admissible. *See* Ohio R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ohio R. Evid. 401. Since Pence's educational background and the fact that he was a conscientious employee and devoted to his mother were not facts of consequence in the guilt phase of Zuern's trial, evidence of those facts was not admissible under state law. However, that is not the issue before the Court. The ques-

---

**23.** The prosecutor prefaced his opening statement by informing the jury that his remarks were not evidence. Doc. # 98 at 834. Zuern's counsel did not object to the prosecutor's statements concerning the victim's character.

**24.** Petitioner's counsel objected on the basis of relevance. Doc. # 98 at 994. The prosecutor argued that it was important to show the jury the type of person who was the victim of the alleged offense.

**25.** In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court overruled *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and held that victim impact evidence was admissible at the *sentencing* phase of a death penalty prosecution. Herein, since the evidence was admitted and the arguments made during the *guilt* phase, *Payne* does not mandate the conclusion that no error was committed.

tion for this Court to resolve is whether the introduction of this evidence and use of the foregoing argument concerning Pence's educational background, his devotion to his job and mother and the like constituted a violation of the Due Process Clause of the Fourteenth Amendment.

In *Brown v. O'Dea*, 187 F.3d 572 (6th Cir.1999), the Sixth Circuit restated the principles which are applicable to a claim by a habeas petitioner that he was denied due process by the introduction of prejudicial evidence:

> Habeas petitioners are not entitled to relief unless an error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). A petitioner will prevail where "a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law" substantially affected a jury's verdict. *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). However, we will grant federal habeas corpus relief only where a violation of a state's evidentiary rule results in the denial of fundamental fairness, and therefore, a violation of due process. *Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir.1988). "The standard in determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness is whether the evidence is 'material in the sense of a crucial, critical highly significant factor.'" *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir.1989) (quoting *Redman v. Dugger*, 866 F.2d 387, 390 (11th Cir.1989)).

*Id.* at 578. *See also, Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.) ("[N]ot all erroneous admissions of [unfairly prejudicial] evidence are errors of constitutional dimension. The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" (citation omitted)), *cert. denied*, 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81, (1998). The Sixth Circuit has applied the same "fundamental fairness" standard when assessing claims in habeas actions challenging the actions of a prosecutor, such as allegations that he engaged in improper argument. *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir.1999).

Herein, this Court cannot conclude that either the evidence of Pence's background or the arguments by the prosecution resulted in a trial which was so fundamentally unfair that it deprived the Petitioner of due process of law. With respect to the prosecutor's informing the jury about Pence's background during opening statements, the prosecutor himself told the jury, just before telling the jury about Pence, that opening statements were not evidence. Therefore, this Court cannot conclude that the mention of Pence's background during opening statements rendered the Petitioner's trial fundamentally unfair. With respect to the evidence concerning Pence's background offered during trial, it should be noted that the jury was quite aware that the victim of the crime was a sheriff's deputy who was performing his official duties, when murdered by an inmate of the institution in which that deputy worked. Given that the jury already knew that Pence was a sympathetic victim, the additional evidence concerning his background, while not relevant, could not have rendered Petitioner's trial fundamentally unfair. With respect to the prosecutor's closing argument, the Petitioner initially focuses upon the prosecutor's statements regarding Stokes' testimony. The Sixth Circuit has indicated that a prosecutor is "entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel." *Beam v. Foltz*, 832 F.2d 1401, 1407 (6th Cir.1987), *cert. denied*, 485 U.S. 980, 108 S.Ct. 1278, 99 L.Ed.2d 489 (1988). Herein, the prosecutor was responding to the

statements of Petitioner's counsel concerning Stokes' testimony. However, those statements were in response to the introduction of irrelevant evidence (i.e., the testimony of Stokes). Therefore, the Court assumes that the prosecutor's rebuttal argument in that regard was not a fair response to the argument of Petitioner's counsel. Nevertheless, the Court cannot conclude that the prosecutor's rebuttal argument, pertaining to Stokes testimony, deprived Zuern of due process. There was never any question that Zuern had killed Pence. The sole issue at his trial was whether he acted with prior calculation and design. The prosecutor's argument concerning Stokes' testimony did not tend to establish that Petitioner had so acted. Finally, the prosecutor mentioned, during the rebuttal phase of his argument, that Pence's mother and other family members cared that a police officer had been killed by someone who was incarcerated and suggested that the jury not tell Pence's mother that Petitioner had committed a simple murder. This Court will assume for present purposes that those arguments were improper; however, improper arguments by a prosecutor do not necessarily render a trial fundamentally unfair. In *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court concluded that a prosecutor's argument, although undesirable or even universally condemned, did render the defendant's trial fundamentally unfair. *Id.* at 178–83, 106 S.Ct. 2464. In part, the Supreme Court noted that the prosecutor's argument had not misstated or manipulated the evidence and that the argument had not implicated a specific right of the defendant (such as the right to remain silent or the right to an attorney). *Id.* at 181–82, 106 S.Ct. 2464. Herein, the prosecutor's allegedly improper argument did none of those things. Moreover, Judge Morrissey instructed the jury that closing arguments were not part of the evidence.

Accordingly, the Court overrules Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, to the extent that those Objections relate to his Fifth Claim.

### F. Seventh Claim [26]

■ With this Claim, Zuern alleges that his right to a fair and impartial jury, as guaranteed by the Sixth and Fourteenth Amendments, was violated when the trial court failed to excuse a juror who, during the course of the trial, overheard a television news story describing the Petitioner's previous murder charge. Judge Merz recommended that this Court dismiss this Claim on its merits. The Court begins its analysis of this Claim by setting forth the circumstances from which it arose.

Before the afternoon session of the first day of the trial on which evidence was presented (i.e., after the lengthy *voir dire* had been conducted), Juror Beulah Taylor ("Taylor") was brought before the court and counsel. The following colloquy occurred:

> The Court: Mrs. Taylor, I would like to determine something, are you sick?
>
> Taylor: I am nervous. I should have told you that in the beginning. I felt I had to do it. I was willing to try.
>
> The Court: Do you think it is too much for you?
>
> Taylor: Yes, I think so.
>
> The Court: Do you have any questions?
>
> Prosecutor: Mrs. Taylor, all I want to know, are you ill?
>
> Taylor: I am nervous. I am a nervous person. I felt that I had to serve as a juror. I would rather not.
>
> Prosecutor: There are a lot of things we don't like to do, but you took an oath of office to do this, you qualified yourself as a juror. We are into the case now, and these are things that are kind of

---

26. Since Judge Merz recommended that the Court grant relief on the Petitioner's Sixth

Claim, Zuern has not objected to that recommendation.

frustrating. I understand that you are nervous. Is it just that you don't want to serve?

Taylor: I would rather not. I feel I can't. I thought that I had to, but I feel now like I can't do it.

The Court: Do you feel like you can't listen to the evidence?

Taylor: I can listen to it. I guess I can.

Prosecutor: Can you take the legal charge that the Judge gives you and apply that law to what you hear?

Taylor: I would rather not.

Prosecutor: What is the reason?

Taylor: I guess I am just too emotional.

Prosecutor: You think that would interfere with your ability to judge this case one way or the other?

Taylor: Maybe. I just don't know.

The Court: No one has called you?

Taylor: I did overhear something and I would rather—

The Court: In the hallway?

Taylor: No, outside. I would rather not do it.

Prosecutor: Where did you overhear this comment or conversation?

Taylor: I overheard it on TV. I would rather not serve.

The Court: You heard something on TV?

Taylor: Yes, this morning. I just happened to overhear it. I would rather not be involved.

Prosecutor: It was just an unintentional thing, and you happened to hear something?

Taylor: I would rather not serve.

Prosecutor: You think it would interfere with your consideration of this case, to be fair and impartial?

Taylor: Not to be fair. I could be fair. I would just rather not, I'm sorry.

Prosecutor: When did you overhear this?

Taylor: This morning.

Prosecutor: At what time.

The Court: Do you know what station?

Taylor: I think it was Channel 12.

Prosecutor: Was it concerning this case?

Taylor: Yes.

Prosecutor: Was it concerning the defendant and the state?

Taylor: Yes, it mentioned him.

The Court: Mr. Wood [defense counsel] do you have any questions that you would like to ask?

Mr. Wood: I haven't heard any reason yet. I know this lady is upset.

The Court: She said that she heard something about the case on Channel 12 this morning.

Mr. Wood: But she said that it wouldn't affect her decision in this case.

Taylor: It wouldn't affect my decision.

Mr. Wood: What did you hear?

Taylor: I heard a version of what had happened, why he was in there in the first place, that he had been there previous, and that upset me, but I could be fair. I want to be fair. I am sorry. I will serve. I could be impartial, yes.

The Court: But you would rather not?

Mr. Wood: Do you think what you heard this morning about the defendant would so influence you that you couldn't serve?

Taylor: No, no. I am hoping not. What is fair I will do. I will be fair, but I also want to be honest.

Mr. Wood: Do you feel like you might have a nervous breakdown over this?

Taylor: No, no.

Mr. Wood: You are highly nervous?

Taylor: Not highly. I guess just like a lot of women.

Mr. Wood: Men get the same way.

Taylor: I am sure they do.

Mr. Wood: You are not ill?

Taylor: No, no, I am not ill, and I will do my best. I will stay.

The Court: Will you give it another day's try?

Taylor: Sure, I will. I would be glad to.

Mr. Wood: We would appreciate it.

Prosecutor: We would rather that you stay.

Taylor: I will.

Doc. # 98 at 923–27. The following morning, before testimony began, Petitioner's counsel met with the court and the prosecutor. Petitioner's counsel indicated that he had reviewed the news broadcast that Taylor had inadvertently seen the previous morning, and that the broadcast was more prejudicial than he had initially believed, since that stated that Zuern's fellow inmates referred to him as a crazy killer. *Id.* at 975–76. Petitioner's counsel moved for a mistrial or, in the alternative, that the court excuse Taylor from the jury. *Id.* at 976. The prosecution objected and suggested that Taylor be brought before the court and counsel, in order that she could be asked what exactly she had heard on the news broadcast. *Id.* Petitioner's counsel agreed that it would be appropriate to question Taylor. *Id.* at 977. After having been brought before the court and counsel, Taylor indicated that the statement that Petitioner had been charged with another murder had upset her and that she had not heard anything else, including how his fellow inmates had described him. *Id.* at 978–79. In response to a question from Petitioner's counsel, she said that she still believed that she could be a fair and impartial juror. *Id.* at 979. The trial court declined either to excuse Taylor or to declare a mistrial.

It is axiomatic that "the requirement that every defendant in a criminal case receive a fair trial by a panel of impartial, indifferent jurors ... is a basic requirement of due process." *United States v. Rigsby*, 45 F.3d 120, 122 (6th Cir.1995) (internal quotation marks and citation omitted). Herein, the Petitioner was not deprived his right to a fair and impartial jury by the failure of the trial court either to excuse Taylor or to declare a mistrial.

In *United States v. Rugiero*, 20 F.3d 1387 (6th Cir.), *cert. denied*, 513 U.S. 878, 115 S.Ct. 208, 130 L.Ed.2d 137 (1994), the Sixth Circuit addressed an analogous issue. Therein, some of the members of the jury heard a televised report, tying the defendant's counsel to organized crime figures. The defendant argued that as a result he had been denied his right to a fair and impartial jury. After the verdict had been returned, the District Court asked each juror separately about the report. While some jurors indicated that they had heard or heard about the television reports, each juror denied that the information obtained had impacted the verdict. Based upon its questioning of the members of the jury, the District Court concluded that the exposure of the jurors to the television reports was not the basis for disturbing the jury's verdict. Upon appeal, the Sixth Circuit affirmed. Initially, that court noted that the District Court "properly made no 'presumption of prejudice' from juror exposure to the television news." *Id.* at 1390. In addition, the Sixth Circuit indicated that the District Court was entitled to view the jurors' assurances of continued impartiality as credible. *Id.* Similarly, herein, the trial court questioned Taylor and, based upon her assurances, concluded that she could continue to serve as a fair and impartial juror, despite having heard a television report concerning the reason for Petitioner's incarceration in the CCI. Indeed, Taylor indicated on two separate occasions that she could be a fair and impartial juror.

Accordingly, the Court overrules the Petitioner's Objections to Judge Merz' Initial and Supplemental Reports and Recommendations, as those Objections relate to Petitioner's Seventh Claim.

## G. Eighth Claim

With his Eighth Claim, Petitioner contends that his conviction and sentence violated the Fifth, Sixth and Fourteenth Amendments, as a result of the prosecutor putting forward evidence and argument

characterizing his (Zuern's) post-arrest silence and failure to testify as proof of his guilt. Judge Merz recommended that this Court dismiss this Claim, as being procedurally defaulted, since the issue was not raised in his direct appeal. As a means of analysis, this Court begins by reviewing the allegedly objectionable testimony and argument.

During its case-in-chief, the prosecution elicited testimony from Ronald Roeckers ("Roeckers"), a deputy employed by the Hamilton County Sheriff's Department who had investigated the murder of Pence. As part of that investigation, Roeckers attempted to interview Zuern, who, after having been given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), refused to give a statement. During the trial, the prosecutor questioned Roeckers on his attempt to interview the Petitioner:

Question: Relative to the defendant, William Zuern, what, if anything, did you and your partner, Mr. Bennett, do?

Answer: We had Mr. Zuern brought into the Supervisor's office, Supervisor Brockmeyer's office, where we attempted to interview him and get some information.

Question: Were you successful at all?

Answer: No sir.

Question: Will you describe to the ladies and gentlemen of the jury and Judge Morrissey whether or not this defendant showed any emotion during the conversation.

Defendant's counsel: We will object to that, your honor. That is subjective. He can describe him, but his subjective analysis is not proper.

The Court: Objection sustained.

Question: Describe his expressions, or lack thereof, and so forth.

Answer: There was no expression.

Question: How can you describe that, "There was no expression," by a word.

Defense Counsel: Objection. That calls for a subjective conclusion.

Prosecutor: His own idea from his personal observation.

The Court: I will allow him to testify as to what he saw.

Answer: Blank.

Doc. # 98 at 983–84. During the opening portion of his closing argument, the prosecutor argued that the lack of remorse shown by the Petitioner indicated that he had acted with purpose and intent, rather than killed Pence by accident. Doc. # 99 at 1089–90. During the closing portion of that argument, the prosecutor recounted Roeckers' testimony, including the fact that Zuern had said nothing when questioned and that his expression had been blank. *Id.* at 1117.

The Petitioner argues that his procedural default, the fact that the issue was not raised in his direct appeal, does not bar the Court from considering this claim, since he can establish cause and prejudice, to wit: the ineffective assistance of appellate counsel in failing to raise the issue. For the reasons that follow, as well as those set forth by Judge Merz in his Initial Report and Recommendations (Doc. # 320), this Court concludes that the Petitioner cannot establish cause and prejudice, as a result of his appellate counsel's failure to raise this issue on direct appeal. It is axiomatic that to establish a claim of ineffective assistance of counsel, a defendant must demonstrate both that the representation afforded by his counsel was deficient and that said representation prejudiced his defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

■ With respect to Roeckers' testimony that he and his partner were unable to interview Zuern, this Court concludes that he cannot establish prejudice. In *Watson v. Marshall*, 784 F.2d 722 (6th Cir.1985), *cert. denied*, 476 U.S. 1107, 106 S.Ct. 1955, 90 L.Ed.2d 363 (1986), the Sixth Circuit addressed an analogous situation. Therein, the petitioner was convicted in state court of murdering his nine month-old grand nephew. After having

exhausted his state remedies, the petitioner sought habeas relief in federal court, arguing, *inter alia*, that his trial counsel had rendered ineffective assistance, by failing to object to testimony from investigating officers to the effect that the petitioner had declined to speak to the officers after having been read his *Miranda* rights. Without addressing the issue of whether trial counsel's performance had been deficient, the Sixth Circuit concluded that the petitioner had failed to demonstrate prejudice, because he had failed to establish that the results of his trial would have been different if the officer's testimony had been excluded. Therein, the questioning of the two officers concerning the petitioner's post-arrest silence was much more extensive than the one question that Roeckers was asked during Zuern's trial. The one statement by Roeckers that he and his partner were unsuccessful in attempting to elicit information from the Petitioner did not result in a trial which produced an unreliable result. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. In addition, although the prosecutor mentioned in the rebuttal portion of his closing argument that the Petitioner had not said anything to Roeckers, the prosecutor did not attempt to tie that statement to the central issue of whether the Petitioner had acted with prior calculation and design.

The other pertinent aspect of Roeckers' testimony was his statement that Zuern showed no emotion or expression, other than a blank look. Petitioner claims that this testimony violated *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) and *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). For reasons which follow, this Court concludes that appellate counsel was not deficient in failing to raise that argument on direct appeal, since the testimony in question did not violate the rule established in those cases. In *Doyle*, the defendants were charged with selling 10 pounds of marijuana to an informant. After having been arrested, the defendants were given their *Miranda* warnings and declined to make statements. During their trials, each of the defendants testified that the informant had been attempting to sell the controlled substance to him, rather than the particular defendant attempting to sell the marijuana to the informant. In an effort to impeach that testimony, the prosecutor asked each of them whether, at the time of being arrested, he had told officers that the informant had attempted to sell marijuana to him. Given that each of the defendants had invoked his *Miranda* right to remain silent, each was compelled to admit that he had not provided that information to the arresting officers. After the defendants' convictions had been affirmed by the Ohio appellate court, and the Ohio Supreme Court had declined their request for further review, the United States Supreme Court reversed, concluding that it was a violation of the Due Process Clause of the Fourteenth Amendment to permit a defendant to be cross-examined on his post-arrest silence, after he had invoked his *Miranda* right to remain silent. In *Greenfield*, the defendant was arrested for committing a sexual assault and, on two occasions, was given his *Miranda* warnings. On each instance, he stated that he understood his rights and that he would not answer the officers' questions until he had spoken to an attorney. To defend against the assault charge, the defendant entered a plea of not guilty by reason of insanity. In an effort to establish that the defendant was sane, the prosecutor introduced testimony from the officers as to what the defendant had said in response to the *Miranda* warnings. In his closing argument, the prosecutor recounted the officers' testimony and suggested that it demonstrated that the defendant was sane. The Supreme Court concluded that *Doyle* forbade the prosecution from using the defendant's post-arrest silence to establish his sanity. In reaching that conclusion, the Supreme Court rejected the state's argument that the testimony in question was necessary in order to permit it to prove that the defendant was

sane, since "the state's legitimate interest in proving that the defendant's behavior appeared to be rational at the time of his arrest could have been served by carefully framed questions that avoided any mention of the defendant's exercise of his rights to remain silent and to consult counsel." 474 U.S. at 295, 106 S.Ct. 634 (footnote omitted). In a footnote to the quoted passage, the *Greenfield* Court noted that the defendant had not raised the issue of whether a prosecutor may legitimately comment upon "purely demeanor or behavior evidence." *Id.* at 295 n. 13, 106 S.Ct. 634.

The fundamental principle that supports both *Doyle* and *Greenfield* is that the *Miranda* warnings carry an implied promise that "silence will carry no penalty." *Doyle,* 426 U.S. at 618, 96 S.Ct. 2240. Since Roeckers' testimony concerning Zuern's blank expression concerned physical facts, rather than relating what Zuern had said, that testimony did not implicate his right to remain silent. Consequently, *Doyle* and *Greenfield* were not violated by the introduction of that testimony. *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), supports this Court's conclusion. Therein, the defendant was arrested for drunk driving and transported to the police station, where he was booked and forced to perform a sobriety test, which was videotaped. The defendant was not given his *Miranda* warnings, before those procedures occurred. After being convicted for drunk driving, the defendant appealed, arguing that the videotape of the booking procedures and the sobriety test should have been suppressed, since he had not been given his *Miranda* warnings before that videotape was made. The Pennsylvania appellate court agreed with the defendant and reversed his conviction. Upon further appeal, the Supreme Court reiterated that the Fifth Amendment protects an individual from being compelled to provide testi-

monial, rather than physical evidence. *Id.* at 589, 110 S.Ct. 2638. Applying that rule, the *Muniz* Court concluded that, with the exception of one question, the videotape would not be suppressed, despite the absence of *Miranda* warnings. Of particular present importance, the Supreme Court held that the slurred nature of the defendant's speech, in response to routine booking questions, did not render the videotape inadmissible, since the physical inability to articulate words in a clear manner constituted physical evidence, rather than evidence of a testimonial nature. Similarly, herein, Zuern's blank expression was physical, rather than testimonial, evidence. Therefore, the *Miranda* warnings given to the Petitioner did not impliedly promise that his expression or demeanor would not be used against him, and *Doyle* and *Greenfield* were not violated by the introduction of testimony or argument concerning Zuern's blank expression.[27] Consequently, the Petitioner has failed to establish that his appellate counsel rendered ineffective assistance by not raising this issue on his direct appeal (their representation was not deficient, and that representation did not cause the Petitioner to suffer prejudice). Thus, he has not demonstrated cause and prejudice, sufficient to excuse his procedural default.

Accordingly, the Court overrules the Petitioner's Objections to Judge Merz' Initial and Supplemental Reports and Recommendations, to the extent those Objections relate to the Petitioner's Eighth Claim.

## H. Ninth Claim

With his Ninth Claim, the Petitioner asserts that his rights under the Sixth and Fourteenth Amendments were violated, because the trial court denied his request for a jury view of the CCI. Judge Merz recommended that this Court dismiss this claim, since any error in refusing

---

**27.** Petitioner has also argued that the prosecutor violated his rights by commenting that he had not shown remorse during his trial. Since the Petitioner's expression during the trial was physical in nature, this Court rejects that assertion. *Accord Maiello v. Edwards,* 1998 WL 230956 (S.D.N.Y.1998), *affirmed,* 1999 WL 758762 (2nd Cir.1999).

to permit a jury view did not rise to the level of a constitutional violation. In his Objections, Zuern argues that the denial of the jury view prevented him from presenting evidence on the key issue of prior calculation and design. According to the Petitioner, a view would have permitted the jury to experience the subhuman conditions at the CCI and, thus, to appreciate that, rather than his being a cold, remorseless person who enjoyed killing in cold blood, he was like a caged animal who lashed out instinctively at a possible threat to his life.

To support that argument, the Petitioner relies upon *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). Therein, the defendant was convicted of murder in state court. Before his trial, the defendant had moved to suppress his confession, arguing that it had been involuntary. The state court overruled that motion and permitted the confession to be introduced in evidence. The prosecutor, during his opening statement, indicated that the state would rely primarily upon the defendant's confession. In response, defendant's counsel told the jury that they should not believe the defendant's confession, because it was rife with inconsistencies and the circumstances under which it had been given cast doubt upon its credibility. In response to defense counsel's opening statement, the prosecutor moved *in limine* to exclude testimony concerning the circumstances of the confession, since such testimony was only relevant to its voluntariness, which was a legal issue for the court to decide in the context of a motion to suppress evidence. The trial court granted the prosecutor's motion, and the defendant was convicted. After his conviction had been affirmed by the Kentucky Supreme Court, the defendant appealed to the Supreme Court of the United States, arguing that he had been denied his constitutional right to a fair opportunity to present a defense. The Supreme Court agreed, holding that, in the absence of any justification, the state would deny a criminal defendant his right to a fair op-portunity to present a defense, under the Sixth and Fourteenth Amendments, by preventing him from introducing evidence which could have cast doubt on the credibility of his confession.

■ Under the law of Ohio, a jury view is not evidence. *See e.g., State v. Richey*, 64 Ohio St.3d 353, 367, 595 N.E.2d 915, 927 (1992); *State v. Hopfer*, 112 Ohio App.3d 521, 542, 679 N.E.2d 321, 334 (1996). *See also*, 1Ohio Jury Instructions § 2.50 (pattern instruction to be given before jury view, to the effect that it is not evidence and that the purpose of a jury view is to help the jury better understand the evidence). Therefore, by denying the Petitioner's request for a jury view, the trial court did not prevent him from presenting *evidence* to support his defense. Indeed, there is no indication in the record that the Petitioner was denied the opportunity to present evidence concerning the conditions at the CCI, in order to support his defense that he had not acted with prior calculation and design. Consequently, the denial of the request for a jury view of the CCI is not remotely similar to *Crane*, and the Petitioner's assertion that the Supreme Court's decision therein supports this Claim is without merit.

■ Moreover, under the law of Ohio, the decision of whether to grant a jury view lies within the sound discretion of the trial court. *State v. Lundgren*, 73 Ohio St.3d 474, 653 N.E.2d 304 (1995). Assuming for sake of argument that Judge Morrissey abused his discretion in refusing the requested jury view, a claim of abuse of discretion by a state court trial judge does not establish a federal constitutional violation. *Sinistaj v. Burt*, 66 F.3d 804 (6th Cir.1995).

Accordingly, the Court overrules the Petitioner's Objections to Judge Merz Initial and Supplemental Reports and Recommendations, as those Objections relate to his Ninth Claim.

*I. Tenth Claim*

■ With this Claim, Zuern asserts that his conviction and sentence violate due process, because the jury was able to observe him while he was shackled. Judge Merz recommended that this Court deny this Claim, as being procedurally defaulted, since the Hamilton County Court of Appeals concluded, in Petitioner's state, post-conviction proceedings, that his shackling claim was barred by *Perry* and the doctrine of *res judicata*. The Petitioner contends that he can establish cause and prejudice, permitting the Court to address the merits of this Claim, as a result of the ineffective assistance rendered by his trial and appellate counsel. For reasons which follow, this Court concludes that the Petitioner has failed to establish cause and prejudice.

At the risk of being repetitive, a claim of ineffective assistance of counsel has two components, to wit: that counsel's performance was deficient and that said performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The defense is prejudiced when counsel commits errors that are "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Herein, the Petitioner has not demonstrated that he suffered prejudice as a result of the failure of counsel to raise the issue of the jury seeing him in shackles.

It bears emphasis that this is not an instance, such as in *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), where a defendant was tried while in restraints. Rather, during the evidentiary hearing conducted by Judge Merz, Jerry Charles Zapf ("Zapf"), one of the jurors in Petitioner's trial, testified that he believed that on one occasion the Petitioner was brought into the courtroom in shackles, while the jury was already seated in the jury box. Doc. # 242 at 196. Zapf testified that he also believed that he

had seen deputies remove the shackles from Zuern's legs. *Id.* at 197.

In *United States v. Moreno*, 933 F.2d 362 (6th Cir.), *cert. denied*, 502 U.S. 895, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991), the Sixth Circuit addressed an analogous claim. Therein, the defendants were inadvertently observed by members of the jury, while they were shackled and being transported by the marshals. After that had occurred, the defendants requested a mistrial, which the District Court declined to grant. In affirming that decision, the Sixth Circuit wrote:

> We have distinguished the inherent prejudice to a defendant who is shackled while in the courtroom from a defendant who has been observed in shackles for a brief period elsewhere in the courthouse. *United States v. Crane*, 499 F.2d 1385, 1389 (6th Cir.), *cert. denied*, 419 U.S. 1002, 95 S.Ct. 322, 42 L.Ed.2d 278 (1974). Defendants are required to show actual prejudice where "[t]he conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial." *Payne v. Smith*, 667 F.2d 541, 544–45 (6th Cir.1981) (quoting *United States v. Diecidue*, 603 F.2d 535, 549 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980)), *cert. denied*, 456 U.S. 932, 102 S.Ct. 1983, 72 L.Ed.2d 449 (1982).

*Id.* at 368.[28] The *Moreno* court concluded that the defendants had failed to demonstrate actual prejudice, in part, because testimony had previously been introduced, informing the jury that the defendants were in custody. Herein, the jury was informed that Zuern had been an inmate in the CCI when Pence was killed. Moreover, during his closing arguments to the jury, the Petitioner's counsel conceded that his client had murdered Pence, focusing his efforts on attempting to convince the jury that his client had not acted with

---

**28.** Petitioner has argued that the fact that the jury viewed him while he was shackled was inherently prejudicial. In accordance with *Moreno*, this Court rejects that argument.

prior calculation and design. Given that the jury knew that the Petitioner had been incarcerated when Pence was killed and, further, since he did not deny having killed that deputy, this Court concludes that Petitioner has failed to show that he suffered actual prejudice as a result of the jury observing him in shackles.

Since the Petitioner's rights were not violated by the jury having viewed him while he was shackled, he was not prejudiced by the failure of his appellate counsel 'to raise that issue in his direct appeal. Therefore, he has not demonstrated cause and prejudice to excuse his procedural default of this issue. Accordingly, the Court overrules Petitioner's Objections to Judge Merz' Initial and Supplemental Reports and Recommendations, as those Objections relate to Petitioner's Tenth Claim.

### J. Eleventh Claim

█ With his Eleventh Claim, Petitioner contends that his rights under the Eighth and Fourteenth Amendments were violated as a result of the trial court's instructions to the jury, prior to deliberations in the guilt phase of the trial. In particular, the Petitioner contends that the trial court gave an erroneous "acquittal first" instruction. After defining the offense of aggravated murder and explaining its essential elements (as well as the specifications with which the Petitioner had been charged), Judge Morrissey told the jury:

> If, and only if, however, you find that the state has failed to prove beyond a reasonable doubt the element of prior calculation and design, you must find the defendant not guilty of aggravated murder and you will proceed and consider whether the defendant is guilty of murder.

29. During the trial, Zuern's counsel requested an instruction reflecting the "hung jury" approach.

30. In *Roland,* the District Court told the jury that, if it found that the Government had failed to meet its burden of proof on the

Doc. #99 at 1130. Judge Merz recommended that this Court dismiss this Claim, as being procedurally defaulted. Zuern challenges that recommendation, arguing that cause and prejudice are demonstrated by the ineffective assistance of his appellate counsel, i.e., their failure to challenge the legality of that instruction on appeal. For reasons which follow, this Court concludes that the instruction was not erroneous under either Ohio or the United States Constitution; therefore, the failure of Petitioner's counsel to raise the issue during his direct appeal did not render their performance deficient. The Court begins its analysis by examining the law of Ohio.

In *State v. Thomas,* 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), the Ohio Supreme Court held, in ¶3 of the syllabus:

> 3. A jury must unanimously agree that the defendant is guilty of a particular criminal offense before returning a verdict of guilty on that offense. If a jury is unable to agree unanimously that a defendant is guilty of a particular offense, it may proceed to consider a lesser included offense upon which evidence has been presented. The jury is not required to determine unanimously that the defendant is not guilty of the crime charged before it may consider a lesser included offense. (*State v. Muscatello,* 57 Ohio App.2d 231, 11 O.O.3d 320, 387 N.E.2d 627 [1977], paragraph three of the syllabus, adopted.)

The approach adopted by the Ohio Supreme Court in *Thomas* has been referred to as the "hung jury" approach.[29] *See* e.g., *United States v. Roland,* 748 F.2d 1321, 1324 (2nd Cir.1984).[30] The *Thomas* court, turning to the question of whether the trial court's instructions had violated the rule set forth in ¶3 of the syllabus, noted that

greater offense, it should consider the lesser offense. The Second Circuit concluded that the District Court's instructions fell between the "acquittal first" and the "hung jury" approaches, although it was closer to the former.

the trial court had read the following instruction to the jury:

"If you find that The (sic) State has proven beyond a reasonable doubt all of the essential elements of the crime of aggravated murder, then your verdict must be that the Defendant is guilty of aggravated murder; and you will not consider the lesser offense."

"However, if you find that The (sic) State has failed to prove beyond a reasonable doubt the element of prior calculation and design, then your verdict must be that the Defendant is not guilty of aggravated murder."

"You will then proceed with your deliberations and decide whether The (sic) State has proven beyond a reasonable doubt all of the essential elements of the lesser crime of murder."

*Id.* at 220, 533 N.E.2d at 293. The *Thomas* court concluded that the quoted instruction had not violated the rule that it had established, since it was ambiguous and did not expressly require that the jury unanimously acquit on the greater offense of aggravated murder, before considering the lesser offense of murder. As with the instruction in *Thomas,* the instruction given during Zuern's trial did not expressly state that the jury must unanimously decide to acquit him on the charge of aggravated murder, before the jurors could consider the lesser included offense of murder. Indeed, the instruction given during Zuern's trial is nearly identical to the final two paragraphs of that given in *Thomas;* therefore, this Court concludes that the instruction did not violate state law.

With respect to the United States Constitution, Zuern relies upon *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Therein, the defendant was convicted of a capital offense and sentenced to death. During his trial he requested an instruction on the lesser included offense of felony murder (which

was not a capital offense). The trial court denied the requested instruction, pursuant to an Alabama statute which had been construed by state courts to preclude any lesser included offense instructions in capital cases.[31] After the defendant's conviction and sentence had been affirmed by the state courts, the Supreme Court held that the practice did not pass constitutional muster, writing:

While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard. That safeguard would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

*Id.* at 637, 100 S.Ct. 2382. The Supreme Court did not, however, indicate that the jury must be instructed under the "hung jury" approach, as opposed to the "acquittal first" approach or something in between. Moreover, no federal court has indicated that the United States Constitution requires that a trial court must employ the "hung jury" approach. On the contrary, the cases would seem to indicate the opposite. In *United States v. Tsanas,* 572 F.2d 340 (2nd Cir.), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978), the District Court, without objection, had expressly instructed the jury that

---

31. The state conceded that, absent the statutory prohibition on lesser included offense in-

structions, the defendant would have been entitled to the one he had requested.

it could not consider the lesser included offense until after unanimously finding the defendant not guilty of the greater offense. After the defendant had been convicted of the greater offense, he argued on appeal that the District Court had committed plain error by giving an "acquittal first" instruction. The Second Circuit noted that the "acquittal first" and the "hung jury" approaches both present advantages and disadvantages to the Government and the defendant:

> The instruction given here [acquittal first] has the merit, from the Government's standpoint, of tending to avoid the danger that the jury will not adequately discharge its duties with respect to the greater offense, and instead will move too quickly to the lesser one. From the defendant's standpoint, it may prevent any conviction at all; a jury unable either to convict or acquit on the greater charge will not be able to reach a lesser charge on which it might have been able to agree. But it entails disadvantages to both sides as well: By insisting on unanimity with respect to acquittal on the greater charge before the jury can move to the lesser, it may prevent the Government from obtaining a conviction on the lesser charge that would otherwise have been forthcoming and thus require the expense of a retrial. It also presents dangers to the defendant. If the jury is heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge.

> An instruction permitting the jury to move on to the lesser offense if after all reasonable efforts it is unable to reach a verdict on the greater likewise has advantages and disadvantages to both sides the mirror images of those associated with the charge actually given here. It facilitates the Government's chances of getting a conviction for something, although at the risk of not getting the one that it prefers. And it relieves the defendant of being convicted on the greater charge just because the jury wishes to avoid a mistrial, but at the risk of a conviction on the lesser charge which might not have occurred if the jury, by being unable to agree to acquit on the greater, had never been able to reach the lesser.

*Id.* at 346 (footnote omitted). Noting that the opposing considerations were balanced, the Second Circuit was unable to say that "either form of instruction is wrong as a matter of law." *Id.* That court did indicate, however, that the District Court should give the form of instruction favored by the defendant, since his liberty is at stake in a criminal trial. *Id.* The Ninth Circuit reached the same conclusion in *United States v. Jackson*, 726 F.2d 1466 (9th Cir.1984). In *United States v. Cardinal*, 782 F.2d 34, 36–37 (6th Cir.1986), the Sixth Circuit held that the giving of an "acquittal first," rather than "hung jury," instruction did not constitute plain error.[32] *See also Catches v. United States*, 582 F.2d 453, 459 (8th Cir.1978) (failure to give "hung jury" instruction is not cognizable in post-conviction proceeding under 28 U.S.C. § 2255, because the asserted error is not of "constitutional magnitude"). Based upon the foregoing authorities, this Court concludes that the instruction employed in Zuern's trial did not violate either the Eighth or the Fourteenth Amendment.

Since the challenged instruction by the trial court did not violate either state law or the United States Constitution, arguing on direct appeal that the "acquittal first" instruction served as the basis for revers-

---

**32.** In *United States v. Amey*, 1995 WL 696680 (6th Cir.1995), the defendant requested a "hung jury" instruction, which the District Court declined to give. The Sixth Circuit concluded that the refusal did not constitute error, since the advantages to such an instruction were speculative.

ing Petitioner's conviction would have been unavailing. Therefore, the performance of his counsel was not deficient, as a result of their failure to raise the issue during his direct appeal. · Consequently, the Petitioner cannot establish cause and prejudice by the failure of his appellate counsel to raise the issue on such appeal. Therefore, this Court concurs with Judge Merz that the Petitioner has procedurally defaulted on this claim. Accordingly, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, as those Objections relate to the Petitioner's Eleventh Claim.

### K. Twelfth Claim

With this Claim, the Petitioner argues that the prosecutor's *voir dire* so indoctrinated the jurors to return a death verdict that he was denied a fair and impartial sentencing proceeding in violation of the Eighth and Fourteenth Amendments. Judge Merz recommended the Court hold that the Petitioner has procedurally defaulted this Claim, since it was not raised in his direct appeal, and, thus, it was barred by the Ohio procedural rule of *res judicata.* The Petitioner objects, arguing that cause and prejudice have been established by the ineffective assistance of his appellate counsel, to wit: their failure to raise the issue on direct appeal.

At the Petitioner's trial, the court permitted counsel to conduct most of the *voir dire.* The Petitioner contends that the prosecutor used that process to indoctrinate the jury to return a death verdict. According to the Petitioner, the prosecutor impermissibly obtained commitments from the potential jurors that each would return a death sentence against him. The Petitioner has cited a number of instances of what he contends demonstrate the prosecutor's improper *voir dire.* For instance, when questioning prospective juror Jerry Zapf ("Zapf"), the prosecutor initially explained the bifurcated nature of a capital case (i.e., the jury would first determine

guilt and, if the defendant were found guilty of aggravated murder, it would decide whether to impose the death penalty). *See* Doc. # 97 at 595–96. After that explanation, the following colloquy took place:

Prosecutor: On a more practical point, when you are back in the jury room, the jury must sign a verdict form, and the first time you are back there deliberating his guilt or innocence, if you find him guilty, you will sign a verdict form that he is guilty as charged of aggravated murder. Do you understand that?

Zapf: Um-hum.

Prosecutor: Likewise, when you are back for the second hearing, if you find that the aggravating circumstances surrounding this event outweigh any mitigating factors that he may present to you, you will sign another verdict form recommending death in the electric chair. O.K.?

Zapf: Yes.

Prosecutor: It will be a paper about this size, with the name of the case and the case number and some wording, and there will be 12 separate lines for each juror to sign. Let's say, for instance, that Mr. Zapf is the 12th juror over there, and you come to the conclusion that he is guilty. Have you ever seen the scales of justice, where the lady is holding out her arms?

Zapf: Yes.

Prosecutor: Visualize that. If you come to a conclusion that the aggravating circumstances outweigh any mitigating factors, and everyone has signed that recommending death in the electric chair, and it comes your turn and they hand you the paper and they say, "put your name there," and you are the last person between him and death in the electric chair, and you have taken an oath as a juror that you will follow the law and that you will do what the law says you will do, if you have found him guilty, and you then find that the aggravating circumstances outweigh the mitigating factors, you will sign that verdict form. It

comes to reality at this point. Will you do it?

Zapf: Yes, I will.

Doc. # 97 at 597–98. The prosecutor was able to obtain similar commitments from other prospective jurors (i.e., if they found that Zuern was guilty and that the aggravating circumstances outweighed the mitigating factors, they would be able to sign the verdict form, even if the last to sign). *See* Doc. # 94 at 67–68 (prospective juror Fred Bray); *Id.* at 112–14 (prospective juror Sandra Miklavic); Doc. # 95 at 175 (prospective juror Marylyn Rohling); *Id.* at 275–76 (prospective juror Lee Weiss); *Id.* at 319–20 (prospective juror William Heyob); Doc. # 96 at 470 (prospective juror Beulah Taylor); *Id.* at 484–85 (prospective juror Raymond Springer); Doc. # 97 at 621 (prospective juror Clara Smith); *Id.* at 678–79 (prospective juror Rava Osborne). In addition, the Petitioner has cited instances in which the prosecutor stressed to the potential jurors that the law of Ohio mandated that the jury impose the death penalty, if the prosecution proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors.

 As is indicated above, the Petitioner argues that the ineffective assistance rendered by his appellate counsel constitutes cause and prejudice, excusing his procedural default of this Claim. This Court does not agree. Ineffective assistance of counsel has two components, to wit: that counsel's performance was deficient and that said performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Since the above-discussed commitments which the prosecutor posed to the prospective jurors did not constitute improper indoctrination of those jurors, the Petitioner was not prejudiced by the failure of his counsel to raise the issue on direct appeal. Under a fair reading of the transcript of the *voir dire,* the prosecutor merely elicited a promise from each juror that he or she would follow the law. Under the law of Ohio, the jury *must* recommend that the death penalty be imposed, if it finds that the state has proved, beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors. *See* Ohio Rev. Code § 2929.03(D)(2) ("If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the jury *shall* recommend to the court that the sentence of death be imposed upon the offender."). Moreover, there is no constitutional impediment to a state enacting a capital punishment statute which mandates the imposition of the death penalty, when the state has proved, beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors. *See Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). *See also, Scott v. Anderson,* 58 F.Supp.2d 767, 796 (N.D.Ohio 1998) (rejecting constitutional challenge to Ohio's capital punishment statutes, on the basis that the death penalty is mandatory when aggravating circumstances outweigh the mitigating factors). The Ohio Supreme Court has also rejected such constitutional challenges. *See e.g., State v. Jells,* 53 Ohio St.3d 22, 35–36, 559 N.E.2d 464, 477 (1990). The prosecutor merely obtained commitments from the prospective jurors that they would sign a verdict form, if they found that the Petitioner had committed the offense of aggravated murder and, further, that the aggravating circumstances outweighed the mitigating factors. In other words, the prosecutor elicited commitments from the jurors to follow the law.[33] The bias of which the Petitioner complains flows from the Ohio statutory

---

33. The Petitioner also points out that the prosecutor equated the imposition of a lesser penalty than death as taking "the easy way out." *See* Doc. # 94 at 67–68. Petitioner's counsel objected to the use of that phrase; however, that objection was overruled. The Petitioner has failed to cite a single case which would support the proposition that the

scheme, rather than from the fact that the prosecutor elicited commitments from the jurors to follow that law and reminded them of same. Indeed, the Petitioner has not cited a single case which would support the proposition that the Eighth Amendment or any other provision of the United States Constitution is violated, when a prosecutor secures such a commitment from potential jurors.[34]

Accordingly, since the Petitioner did not suffer prejudice as a result of the failure of his counsel to raise this issue during his direct appeal, he has not demonstrated that their representation constituted ineffective assistance of counsel under *Strickland*. Consequently, he has failed to establish cause and prejudice for the procedural default of this Claim. Therefore, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, to the extent that those Objections relate to Zuern's Twelfth Claim.

## L. Thirteenth Claim

■ With this claim, the Petitioner argues that he was denied a fair and impartial jury, as guaranteed by the Sixth and Fourteenth Amendments, when the prosecutor systematically exercised its peremptory challenges to remove all prospective jurors who had expressed any hesitancy about imposing the death penalty. Judge Merz recommended that this Court dismiss this claim, as being procedurally defaulted, since the Petitioner had not shown cause and prejudice. In reaching his recommendation, that judicial officer analyzed the merits of this claim, and concluded that the Petitioner had not been denied his constitutional rights by the prosecution's use of peremptory challenges to exclude from the jury those individuals who had expressed any hesitancy about imposing the death penalty. Based upon that conclusion, Judge Merz held that the Petitioner had not been denied effective assistance of counsel, either during trial or on appeal, by the failure of his attorneys to raise the issue. The Petitioner argues that the ineffective assistance of his trial and appellate counsel in that regard establish cause and prejudice. Employing the same analytical framework as Judge Merz, this Court concludes that Petitioner's trial and appellate

prosecutor's use of that hyperbolic phrase violated his constitutional rights. Since this Court has also been unable to find any such precedent, it rejects the argument that the use of the quoted phrase by the prosecutor violated any rights of the Petitioner.

**34.** To support this Claim, the Petitioner has cited *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Therein, the Supreme Court held that the defendant was denied his right to an impartial jury, as guaranteed by the Sixth and Fourteenth Amendments, because the prosecution had been permitted to challenge for cause every potential juror who had expressed any reservations about or hesitancy to impose the death penalty. As the Petitioner points out, the *Witherspoon* Court noted that "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him." *Id.* at 522 n. 21, 88 S.Ct. 1770. The *Witherspoon* Court also indicated that a state "may not entrust the determination of whether a man should live or die to a tribunal

organized to return a verdict of death." *Id.* at 522, 88 S.Ct. 1770. This Court cannot agree with the Petitioner that the quoted statements in any manner support his assertion that the prosecutor engaged in improper *voir dire*. When the Supreme Court decided *Witherspoon*, the Illinois statutes gave the jury unfettered discretion whether to impose the death penalty in capital cases. Therefore, a juror could not have been expected to state whether he would impose that penalty in the case before him. In contrast, the imposition of the death penalty is mandatory in Ohio, if the prosecution proves, beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors. The prosecutor was not asking the potential jurors to predict whether they would vote to impose the death penalty; rather, he was asking them whether they would follow the law and reminding them of that law. Nothing in *Witherspoon* remotely suggests that the prosecutor's questioning and statements herein were improper. Moreover, the Petitioner has not argued that any potential juror was excluded for cause in violation of *Witherspoon*.

counsel were not ineffective and that, therefore, this Claim must be dismissed.

With this Claim, Zuern combines the jurisprudence established by the Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Witherspoon*, the Supreme Court held that the defendant was denied his right to an impartial jury, as guaranteed by the Sixth and Fourteenth Amendments, because the prosecution had been permitted to challenge for cause every potential juror who had expressed any reservations about or hesitancy to impose the death penalty.[35] Zuern argues that, if it is unconstitutional for a prosecutor to challenge, for cause, a potential juror who has expressed reservations about the death penalty, it should also be unconstitutional for a prosecutor to exercise his peremptory challenges in such a manner.[36] Although the Petitioner acknowledges that the practice he challenges is apparently commonplace,[37] he seeks to find support for that proposition in *Batson*, wherein the Supreme Court limited the right of prosecutors to exercise peremptory challenges. In particular, the *Batson* Court held that the defendant's rights under the Equal Protection Clause of the Fourteenth Amendment had been violated by the prosecutor's use of peremptory challenges to exclude African–Americans from the jury.[38]

This Court cannot agree with the Petitioner that his constitutional rights were violated by the use of peremptory challenges to exclude jurors who voiced concerns during voir dire about the death penalty. Every federal appellate court which has addressed the issue has concluded that *Batson* does not extend to the use of peremptory challenges in such a manner. *See Pitsonbarger v. Gramley*, 141 F.3d 728 (7th Cir.), *cert. denied*, 525 U.S. 984, 119 S.Ct. 448, 142 L.Ed.2d 402 (1998); *Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990). Moreover, although the Sixth Circuit has not addressed the issue, that court has refused to extend *Batson* to situations other than race or gender. *United States v. Maxwell*, 160 F.3d 1071, 1075–76 (6th Cir.1998).[39] *See also, Buchanan v. Kentucky*, 483 U.S. 402, 416, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) ("*Witherspoon*-excludables are not a distinctive group for fair cross section purposes").

35. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court explained that, under *Witherspoon*, "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at 424, 105 S.Ct. 844 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)).

36. Judge Merz found that three of the four potential jurors, whom the prosecutor had excluded with peremptory challenges, had expressed hesitancy about the death penalty. The Respondent has not challenged that finding.

37. In *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), the Supreme Court refused to apply a harmless er-

ror analysis to *Witherspoon* violations. In its decision, the *Gray* Court noted that prosecutors often use peremptory challenges to exclude jurors who cannot be removed for cause under *Witherspoon*. *Id.* at 667–68, 107 S.Ct. 2045.

38. In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Supreme Court extended *Batson* to instances where peremptory challenges are employed to exclude individuals from a jury on the basis of their gender.

39. In *Maxwell*, the defendant argued that the prosecutor had unconstitutionally used peremptory challenges to exclude two jurors, who were 18 and 21 years old. The Sixth Circuit rejected that argument, writing "[t]he practice of allowing peremptory challenges may be overridden only for the strongest constitutional reasons, which the Supreme Court has recognized in cases of race and gender discrimination." 160 F.3d at 1076.

Given that the Petitioner's constitutional rights were not violated by the prosecutor's use of peremptory challenges, his trial counsel were not ineffective, because they failed to object to that practice. For the same reason, Petitioner's appellate counsel were not ineffective, because of their failure to raise the issue on appeal. Therefore, the Petitioner has not established cause and prejudice. Accordingly, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, to the extent those Objections relate to the Thirteenth Claim.

## M. Fourteenth Claim

 With this Claim, the Petitioner asserts that his sentence violates the Eighth and Fourteenth Amendments, because Judge Morrissey permitted him to waive his right to present mitigating evidence. After the jury had found him guilty of aggravated murder, and before the sentencing phase of the trial commenced, the Petitioner's trial counsel read the following signed statement, which had been signed by Zuern:

"I, William G. Zuern, after conferences with my attorneys, Robert V. Wood and Thomas Stueve, and having been fully advised of all my rights under mitigation, Section 2923.03 of the Ohio Revised Code, realizing that I could request a presentence investigation and require a mental examination and reports, and further that I could offer any testimony from witnesses and that I could either testify under oath or make a statement not under oath and not be subject to cross-examination; hereby instruct my attorneys that I do not desire to do any of the foregoing.

"This is my decision alone and I am making it freely and voluntarily. It is my opinion that no testimony which I or anyone else might offer would have any effect on the decision of this jury.

"I am fully aware that if I do not offer any evidence in mitigation, the jury can come to but one decision, that being death by electrocution.

"I have no 'death wish' and I do not wish to die; however, it is not my nature to beg or crawl. In light of all of the circumstances, I wish to maintain my self-respect.

"I am completely satisfied with the legal services and efforts in (sic) my behalf rendered by my attorneys, Robert V. Wood and Thomas Stueve."

Doc.# 99 at 1151–52. After that statement was read, Zuern's counsel asked his client whether he had signed the statement and whether he had made it voluntarily. *Id.* at 1152. Zuern answered affirmatively to each of those questions. *Id.* The following colloquy then occurred between Judge Morrissey and Zuern, to wit:

The Court: William Zuern, is this signature on the line indicated here for the defendant your signature?

The Defendant: Yes.

The Court: After discussing your case with your attorneys, you think it is to your best advantage to publish this statement?

The Defendant: Yes.

The Court: Has anyone made any promises to you in consideration for you making this statement?

The Defendant: No.

The Court: You understand the proceeding and procedure that is going on here?

The Defendant: Yes.

The Court: Do you understand that you have a constitutional right to defend yourself?

The Defendant: Yes.

The Court: You choose not to do so?

The Defendant: Yes.

The Court: The Court will accept this entry. I would like to tell you something Mr. Zuern. You do have the right to present a mitigation hearing. In the mitigation hearing there are seven items that I would like to let you know about

that could be taken into consideration: whether the victim of the offense induced or facilitated it; whether it is likely that the offense would have been committed, but for the fact that the offender was under duress, coercion or strong provocation; whether at the time of committing the offense the defendant, because of a mental disease or defect, lacked substantial capability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law; the youth of the defendant; the defendant's lack of a significant history of prior criminal convictions and delinquency adjudications; if the defendant was a participant in the offense, but not the principal offender; the degree of the defendant's participation in the offense and the degree of the defendant's participation in the acts that led to the death of the victim; and any other factors that are relevant to the issue of whether the defendant should be sentenced to death.

Now, the law of Ohio provides that you may consider all of those mitigating factors that I have just outlined. You have that right to have this mitigation hearing.

Do you waive that mitigation hearing?

The Defendant: Yes.

The Court: You wish to present no evidence in mitigation; is that a correct statement?

The Defendant: Right.

*Id.* 1152–54. The Petitioner contends that the trial court erred by failing *sua sponte* to conduct a hearing to determine whether he was competent to waive his right to present mitigation evidence.[40] Judge Merz found this claim to be procedurally defaulted, because it was not raised on his direct appeal. Although the Petitioner did not present this contention in his direct appeal, and, thus, the state courts refused to address it in his post-conviction proceedings, he contends that cause and prejudice are demonstrated by the ineffective assistance rendered by his trial and appellate counsel, to wit: the failure of his trial counsel to insist that a competency hearing be conducted before the trial court permitted Zuern to waive his right to present mitigating evidence and the failure of his appellate counsel to raise the question on direct appeal. In the absence of an indication that Petitioner was not competent to stand trial, the failure to conduct a competency hearing, before permitting him to waive his right to present mitigating evidence, did not violate either state law or the United States Constitution. Accordingly, this Court concludes that the Petitioner has not demonstrated that either his trial or appellate counsel rendered ineffective assistance of counsel; therefore, he has failed to establish cause and prejudice.

As an initial matter, the Ohio Supreme Court has indicated that, in the absence of indicia of incompetency, a court need not conduct a competency hearing before permitting a death penalty defendant to waive the right to present mitigat-

---

**40.** The Petitioner has cited a number of cases in which the Supreme Court has indicated that a defendant facing the death penalty has a right under the Eighth Amendment to present all manner of mitigating evidence. *See e.g., Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Those cases are inapposite, since the issue raised by this Claim is not whether Ohio could have prevented the Petitioner from presenting some type of mitigating evidence. Rather, the question is whether the Petitioner could waive his right to present such evidence, without the trial court first conducting a hearing to determine whether he was competent to do so.

In addition, the Petitioner has cited decisions by state courts outside of Ohio, which have held that a death penalty defendant cannot waive the right to present mitigating evidence. The Ohio Supreme Court has rejected that proposition. *See e.g., State v. Cowans*, 87 Ohio St.3d 68, 80, 717 N.E.2d 298, 310 (1999). Zuern does not argue that the Eighth Amendment prohibits states from permitting a defendant to waive that right. Given that the Supreme Court has not prohibited death penalty defendants from waiving the right to a trial (*Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)), such an argument would have been unavailing.

ing evidence. *State v. Cowans,* 87 Ohio St.3d 68, 81, 717 N.E.2d 298, 311 (1999). *See also, State v. Tyler,* 50 Ohio St.3d 24, 29, 553 N.E.2d 576, 585 (mere fact that a defendant waives the right to present mitigating evidence, because he wants to die, does not call his competence into question), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 334 (1990). Herein, there is no evidence that the Petitioner exhibited any indicia of incompetence during his trial. Indeed, under the law of Ohio, a criminal defendant is presumed to be competent to stand trial. *See* Ohio Rev.Code § 2945.37(G). *See also, State v. Williams,* 23 Ohio St.3d 16, 490 N.E.2d 906 (1986) (presumption of competency can be overcome by the preponderance of the evidence).[41] If a course of action does not result in the denial of a constitutional right, the client has not been deprived of effective assistance of counsel or prejudiced by that course of action. Therefore, the failure of Petitioner's counsel to request a competency hearing or to raise the issue during his direct appeal did not constitute ineffective assistance of counsel.

In *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), the Supreme Court addressed the question of whether different standards were applicable for ascertaining, on one hand, a death penalty defendant's competence to stand trial and, on the other, his competence to waive his right to a trial (by pleading guilty) and to the assistance of counsel. Therein, Moran was charged with multiple counts of capital murder. After having entered a plea of not guilty, he informed the trial court that he wished to discharge his counsel and to enter pleas of guilty.[42]

The trial court permitted him to do so. The defendant was convicted on his guilty pleas and sentenced to death. Thereafter, Moran initiated post-conviction proceedings in state court, claiming that he had been mentally incompetent to represent himself. After the state courts had denied him relief, Moran filed a habeas action in federal court. The District Court dismissed the petition, concluding that, since Moran was competent to stand trial, he was competent to waive his right to a trial and to be represented by counsel. The Ninth Circuit, however, reversed, concluding that a heightened standard for ascertaining competency applied to waivers of the right to a trial and to be represented by counsel. Upon further appeal, the Supreme Court disagreed, holding that the same standard for determining whether an individual is competent to stand trial is applicable to the rights that Moran had waived by dismissing his counsel and pleading guilty.[43] Despite Petitioner's eloquent description of the important role which mitigation evidence plays in death penalty cases, there is no basis for concluding that a higher standard is applicable to the waiver of the right to present such evidence, than that which the Supreme Court applied in *Godinez.* Therein, the Supreme Court reiterated that "the standard for competence to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Id.* at 396, 113 S.Ct. 2680 (citation and internal quotation marks omitted).

41. The Supreme Court has held that a state does not violate due process by presuming that a criminal defendant is competent to stand trial and imposing upon him the obligation of proving by the preponderance of the evidence that he is not competent. *Medina v. California,* 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992).

42. Moran informed the trial court that he wished to discharge his counsel and to enter guilty pleas, in order to prevent the introduction of mitigating evidence.

43. Of course, the waiver of a right to trial (by pleading guilty) and to be represented by counsel must be intelligent and voluntary. 509 U.S. at 402, 113 S.Ct. 2680. Zuern has not suggested that his waiver of the right to present mitigating evidence was either unknowing or unintelligent.

Herein, there is no evidence that the Petitioner lacked the requisite competency to stand trial. Indeed, the Petitioner has not raised that issue in any of his proceedings in state court or before this Court; nor has he presented any evidence which could have overcome the statutory presumption of competence. *See* Ohio Rev. Code § 2945.37(G). In the absence of some indication or evidence that the Petitioner lacked the ability to consult with his counsel and to understand the proceedings against him, this Court cannot conclude that his trial counsel were ineffective, because they failed to insist that the trial court conduct a competency examination, before permitting their client to waive his right to present evidence in mitigation. In addition, in the absence of such an indication or evidence, this Court cannot conclude that his appellate counsel were ineffective, because they failed to raise that issue on direct appeal.

Accordingly, the Petitioner has not demonstrated that either his trial or appellate counsel were ineffective, because they failed to raise the issue of his competency to waive the presentation of mitigating evidence. Consequently, he has not established cause and prejudice for the procedural default of this Claim. Therefore, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, to the extent that those Objections relate to Zuern's Fourteenth Claim.

*N. Fifteenth Claim*

█ With this Claim, the Petitioner argues that his death sentence violates the Sixth and Eighth Amendments, as well as the Due Process Clause of the Fourteenth Amendment, because the trial court relied upon an *ex parte* presentence investigation report that was obtained without his knowledge or consent. The Court begin its analysis of this Claim by reviewing the circumstances from which it arises.

Although the jury returned a verdict, recommending that a sentence of death be imposed upon the Petitioner, Judge Morrissey was not required to accept that recommendation. Rather, before deciding whether to sentence the Petitioner to death, he was obligated to conduct his own independent review to ascertain whether the evidence established beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. *See* Ohio Rev.Code § 2929.03(D)(3). When he imposed sentence upon the Petitioner, Judge Morrissey said, on two occasions, that he had considered all of evidence introduced at trial and the arguments of counsel, "along with the presentence report." Doc. # 99 at 1172, 1177. Under the law of Ohio, a presentence report is not prepared in a death penalty case, unless the defendant requests one. *See* Ohio Rev.Code § 2929.03(D)(1). The Petitioner explicitly indicated that, although he knew that he had the right to request such a report, he had instructed his counsel that he did not want one prepared. Doc. # 99 at 1151–52. Moreover, there is no indication in the record that the Petitioner was permitted to review the report, before sentence was imposed. Subsequent to the imposition of sentence, Judge Morrissey, in accordance with Ohio law, issued his sentencing opinion,[44] wherein he found that the evidence established, beyond a reasonable doubt, that the aggravating circumstances of which the Petitioner had been found guilty outweighed the mitigating factors. *See* Doc. # 89 at Ex. C. In that opinion, he did not mention the presentence investigation report or any information contained therein.

The Petitioner contends that he was denied due process, as a result of the trial court imposing sentence upon him, in part, on the basis of the presentence report. When the Petitioner raised this issue during his post-conviction proceedings in state

---

44. Under Ohio Revised Code § 2929.03(F), the sentencing court is required to state in a separate opinion its findings and reasons for imposing the death penalty.

court, the Hamilton County Court of Appeals concluded that the issue was barred by the Ohio doctrine of *res judicata.* As a result, Judge Merz concluded that this Claim was procedurally barred, since the Petitioner could not demonstrate cause and prejudice for the failure of his appellate counsel to raise it during his direct appeal. The Petitioner objects, arguing that he can establish cause and prejudice, to wit: the failure of his appellate counsel to raise the issue on direct appeal.[45] In order to establish a claim of ineffective assistance of counsel, a defendant must establish both that the representation afforded by his counsel was deficient and that said representation prejudiced the defense. *Strickland, supra.*

The Petitioner can easily establish the first prong of that standard, since counsel was unquestionably deficient in failing to raise the issue on direct appeal. In *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court considered the nearly identical question as is presented by this Claim. Therein, the defendant had been convicted was convicted of murder by a Florida jury, which also recommended that he be sentenced to life imprisonment.[46] Before imposing sentence, the trial court ordered a presentence investigation report; however, only a portion of it was disclosed to the defendant. Thereafter, the trial court rejected the jury's recommendation and sentenced the defendant to death, indicating that the decision had been based, in part, on information contained in the presentence report.[47] A plurality of the Supreme Court concluded that the defendant had been "denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or [to] explain." *Id.* at 362, 97 S.Ct. 1197.[48] Under *Gardner,* the Petitioner had a due process right to see the presentence report and to rebut its contents, before the sentence of death was imposed upon him. Given that, during the sentencing, Judge Morrissey indicated twice that he was relying upon such a report, the performance of Petitioner's appellate counsel was rendered deficient by their failure to raise that issue on direct appeal. Thus, the Petitioner has established the cause prong of the cause and prejudice test (i.e., that his appellate counsel rendered deficient representation).

The question becomes, therefore, whether that performance caused the Petitioner to suffer prejudice. In *Strickland,* the Supreme Court said that a defendant is prejudiced when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687, 104 S.Ct. 2052. In *Glenn v. Tate,* 71 F.3d 1204, 1210 (6th Cir.1995), *cert. denied,* 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996), the Sixth Circuit

45. Petitioner also argues that application of the procedural bar is inappropriate with regard to this Claim, because the trial court addressed its merits during his post-conviction proceedings. This Court does not agree. The Supreme Court has indicated that, when deciding whether a claim has been procedurally defaulted, a federal court must look to the last reasoned state court decision. *See Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). The Hamilton County Court of Appeals was the last state court to pass on this Claim, and it unquestionably found it to be barred by *res judicata.*

46. Under the law of Florida, a jury's recommendation of life imprisonment was not binding on the Court. Under the law of Ohio, a jury's verdict on a punishment, other than a

recommendation of death, *is* binding on the trial court.

47. It was unclear whether the trial court had even relied on the portion of the presentence report which had not been disclosed.

48. Although *Gardner* was a plurality opinion, the Supreme Court has subsequently relied upon that decision. *See e.g., Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (relying upon plurality opinion in *Gardner,* in holding that defendant is denied due process, when sentenced to death without being permitted to rebut state's evidence of future dangerousness with jury instruction that sentence of life imprisonment was without possibility of parole).

indicated that, under *Strickland*, the petitioner must show a "reasonable probability" that, but for counsel's errors, the result would have been different. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. *Id.* For reasons which follow, this Court concludes that there is not a reasonable probability that the result of Petitioner's appeal would have been different, if his appellate counsel had raised this issue on his direct appeal.

As is indicated above, an Ohio jury merely recommends that a sentence of death be imposed.[49] Under the law of Ohio, the trial court is required to impose the death penalty, if it finds, by proof beyond a reasonable doubt, that "the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors." Ohio Rev.Code § 2929.03(D)(3). The Ohio statutes do not allow a trial court to sentence a defendant to death unless such a finding has been made. Herein, the jury found that the Petitioner was guilty of the three aggravating circumstances or specifications set forth in the indictment. Since the Petitioner declined to introduce any evidence of mitigating factors, the finding that the aggravating circumstances outweighed the mitigating factors was inevitable. Consequently, the information contained in the presentence investigation report cannot have affected Judge Morrissey's conclusion that the evidence proved, beyond a reasonable doubt, that the aggravating circumstances of which the Petitioner had been found guilty outweighed the mitigating factors.[50] Moreover, both the Hamilton County Court of Appeals and the Ohio Supreme Court, as required by Ohio Revised Code § 2929.05, conducted an independent review of the record and concluded that the evidence established beyond a reasonable doubt that the aggravating cir-

cumstances outweighed the mitigating factors. As the Petitioner points out, the presentence investigation report was not part of the record on appeal. Therefore, that document cannot have been considered by the two appellate courts, when they conducted their independent review.

However, assuming *arguendo* that the presentence report had been part of the record on appeal and that the Petitioner's counsel had raised the issue of Judge Morrissey's mention of that report on his direct appeal, the result of the Petitioner's appeal would not have been different. In *State v. Bays*, 87 Ohio St.3d 15, 31, 716 N.E.2d 1126, 1143 (1999), the Ohio Supreme Court addressed an analogous situation. Therein, the defendant had raised his addiction to crack cocaine as a mitigating factor. When it conducted its own independent review of whether the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors, the Greene County Court of Appeals found that the defendant's addiction was not a significant mitigating factor. In large measure, the appellate court based its conclusion upon a treatise, which discussed the interplay between cocaine addiction and crime. The Ohio Supreme Court, relying upon *Gardner*, concluded that the appellate court had erred in relying upon that treatise, without subjecting it to adversarial testing. The remedy for that error, however, was for the Ohio Supreme Court to conduct its own, statutorily mandated, independent review, without considering the treatise. Therefore, if the Petitioner's appellate counsel had raised the issue of the presentence investigation report on his direct appeal, the Hamilton County Court of Appeals and the Ohio Supreme Court would have cured that error by conducting their statutorily mandated independent reviews, without considering the report. Given

---

**49.** However, a jury's recommendation of a sentence other than death is binding upon the trial court. *See* Ohio Rev.Code § 2929.03(D)(2).

**50.** In other words, nothing in the presentence report could possibly have negated mitigating evidence presented by the Petitioner, since he declined to present such evidence.

that such reviews occurred, since the pre-sentence report was not part of the record on appeal, this Court concludes that the Petitioner has failed to establish prejudice under *Strickland*.

Accordingly, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, to the extent that those Objections relate to Petitioner's Fifteenth Claim.

## O. Sixteenth Claim

■ With this claim, Zuern asserts that his conviction and sentence were obtained in violation of the Due Process Clause of the Fourteenth Amendment, because the trial court's instructions on proof beyond a reasonable doubt diminished the state's burden of proof. At the conclusion of the guilt phase of the trial, the court instructed the jury on the state's burden of proof, as follows:

> The plea of not guilty to aggravated murder puts in issue all essential elements of the crime charged in this indictment. The defendant, William G. Zuern, is presumed to be innocent until his guilt is established, beyond a reasonable doubt. The defendant must be acquitted unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the crime charged in the indictment.
>
> What is reasonable doubt? Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are *firmly convinced* of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not a mere possible

> doubt, because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt.
>
> Proof beyond a reasonable doubt is of such character that an ordinary person would be *willing to rely and to act* upon it in the most important of his own affairs. If after full and impartial consideration of all the evidence you are *firmly convinced* of the truth of the charge, the state has proved its case beyond a reasonable doubt. If you are not *firmly convinced* of the truth of the charge, you must find the defendant not guilty.

Doc. # 99 at 1121 (emphasis added). Petitioner's counsel did not object to the instruction, nor was the issue raised on direct appeal. Judge Merz concluded that, as a result, this Claim was procedurally defaulted. The Petitioner contends that he can demonstrate cause and prejudice, excusing any procedural default, by virtue of the ineffective assistance provided by his trial and appellate counsel. Since this Court concludes that the definition of reasonable doubt given to the jury violated neither state law, nor the Due Process Clause, the Petitioner's trial counsel was not ineffective, by failing to object to the instruction, and his appellate counsel did not neglect to provide effective assistance, by failing to raise the issue on Zuern's direct appeal.

As an initial matter, the trial court's instruction concerning reasonable doubt was taken nearly verbatim from the statutory definition of that term contained in Ohio Revised Code § 2901.05(D).[51] Therefore, state law did not provide the basis for objecting to the charge. However, Zuern

---

**51.** Section 2501.05(D) provides:

(D) "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because every-

thing relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

contends that the charge violated his rights under the Due Process Clause in two particulars, to wit: because the phrase "firmly convinced" describes the burden of proving a fact by clear and convincing evidence, rather than beyond a reasonable doubt; and because the trial court explained reasonable doubt in terms of a willingness to act, rather than hesitation to act. Neither of those reasons convinces this Court that the trial court's definition of reasonable doubt violated Petitioner's right to due process.

In *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583, (1994), the Supreme Court wrote:

> The government must prove beyond a reasonable doubt every element of a charged offense. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Although this standard is an ancient and honored aspect of our criminal justice system, it defies easy explication.

*Id.* at 5., 114 S.Ct. 1239 The *Victor* Court also noted that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." In *Thomas v. Arn*, 704 F.2d 865 (6th Cir.1983), the petitioner was convicted in an Ohio court of murder. After exhausting his state remedies, he initiated a habeas action, alleging, *inter alia*, that he had been deprived of due process of law by the use of the statutory definition contained in § 2901.05(D), to instruct the jury on the meaning of reasonable doubt. In particular, the petitioner had focused upon the "willing to act" language of that statutory definition. The District Court denied the requested relief, and the Sixth Circuit affirmed, con-

cluding that the using of the "willing to act" language to instruct on reasonable doubt had not diluted the state's burden of proof so as to constitute a denial of due process.[52] With respect to Petitioner's assertion that the use of the phrase "firmly convinced" constituted a deprivation of due process, the Eighth Circuit recently considered and rejected a similar argument, writing:

> [Petitioner's] challenge focuses on the use of the words "firmly convinced" to describe the concept of reasonable doubt. The relevant portion of the instruction used in Harris's case reads as follows:
>
> > Proof beyond a reasonable doubt is proof that leaves you *firmly convinced* of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.
>
> (J.A. at 272.) (emphasis added). This standard is substantially similar to a reasonable doubt instruction promulgated by the Federal Judicial Center. In relevant part, that instruction reads:
>
> > "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.... [I]n criminal cases the law does not require proof that overcomes every possible doubt. If, based upon your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must

---

**52.** Herein, the Petitioner relies upon *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), wherein the Supreme Court expressed a preference for defining reasonable doubt in terms of a hesitation to act, rather than with reference to a willingness to act. That decision does not remotely support the proposition that the use of the phrase "willingness to act" constituted a de-

privation of due process. Indeed, although the *Holland* Court expressed its preference, it also concluded that defining probable cause in terms of a willingness to act could not mislead the jury; therefore, the Supreme Court held that the use of such language was not the basis for reversing the defendant's conviction.

find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty." Federal Judicial Center, Pattern Criminal Jury Instructions, at 17–18 (instruction 21). *Victor*, 511 U.S. at 27, 114 S.Ct. 1239 (Ginsburg, J., concurring in part and concurring in the judgment).

Several of our sister circuits have endorsed the same or a similar reasonable doubt instruction. *See, e.g., United States v. Brand*, 80 F.3d 560, 566 & n. 8 (1st. Cir.1996), *cert. denied*, 519 U.S. 1077, 117 S.Ct. 737, 136 L.Ed.2d 676 (1997); *United States v. Conway*, 73 F.3d 975, 980 (10th Cir.1995); *United States v. Williams*, 20 F.3d 125, 131–32 (5th Cir.), *cert. denied*, 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994). Moreover, in *Victor*, Justice Ginsburg described the Federal Judicial Center instruction as a "clear, straightforward, and accurate" explanation of reasonable doubt. 511 U.S. at 26, 114 S.Ct. 1239. *Harris v. Bowersox*, 184 F.3d 744, 751 (8th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 840, 145 L.Ed.2d 706 (2000). This Court agrees with the rationale employed and the result reached by the Eighth Circuit, and will follow same. *Accord, Scott v. Anderson*, 58 F.Supp.2d 767, 807 (N.D.Ohio 1998) (rejecting argument that jury instruction based upon § 2901.05(D) deprived petitioner of due process, because the phrase "firmly convinced" diluted the state's burden of proof).

Based upon the foregoing, the Court concludes that the Petitioner has failed to establish that his trial and appellate counsel were ineffective for failing to challenge, either at trial or upon appeal, the trial court's instruction on reasonable doubt. Therefore, he has failed to demonstrate cause. and prejudice to excuse his procedural default. Accordingly, the Court overrules the Petitioner's Objections to Judge Merz' Initial and Supplemental Reports and Recommendations, to the extent that those Objections relate to the Sixteenth Claim.

### P. Seventeenth Claim

With this Claim, Zuern asserts that his state post-conviction relief proceedings did not afford him an adequate corrective process, which resulted in a denial of his right to due process of law, as guaranteed by the Fourteenth Amendment. Judge Merz recommended that the Seventeenth Claim be dismissed on the merits. This Court agrees. In *Kirby v. Dutton*, 794 F.2d 245 (6th Cir.1986), the Sixth Circuit held that allegations that. a petitioner had been denied due process and equal protection in state post-conviction proceedings were not cognizable in a habeas corpus action. To reach that conclusion, the *Kirby* court started from the premise that habeas corpus, under 28 U.S.C. § 2254, is only available to challenge the constitutionality of a petitioner's detention. . *Id.* at 246. Building upon that premise, the Sixth Circuit concluded that claims of constitutional deprivations, occurring during state post-conviction proceedings, were not cognizable under § 2254, since such claims address collateral matters and not the underlying state conviction giving rise to the petitioner's incarceration. *Id.* at 247. *Accord, Johnson v. Collins*, 1998 WL 228029 (6th Cir.1998); *Trevino v. Johnson*, 168 F.3d 173 (5th Cir.) (and cases cited therein), *cert. denied*, —— U.S. ——, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999). Therefore, this Court holds that the Petitioner's Seventeenth Claim is not cognizable in this litigation. Accordingly, the Court overrules the Petitioner's Objections to Judge Merz' Initial and Supplemental Reports and Recommendations, as those Objections relate to Zuern's Seventeenth Claim.

### Q. Eighteenth Claim

With this Claim, Petitioner contends that his conviction and sentence were obtained in violation of the Sixth and Fourteenth Amendments, because the attor-

neys representing him during his trial failed to provide effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court wrote:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052. In *United States v. Fortson*, 194 F.3d 730 (6th Cir. 1999), the Sixth Circuit wrote:

We "presume from the outset that a lawyer is competent, and therefore, 'the burden rests on the accused to demonstrate a constitutional violation.'" *Pierce*, 62 F.3d at 833 (quoting *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Moreover, in applying *Strickland*, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

The trial process contains a myriad of complex decisions that, for strategic reasons, are sound when made, but may appear unsound with the benefit of hindsight. The defendant, thus, must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted). *Id.* at 736.

The Petitioner contends that his trial counsel were deficient in the following areas, to wit: pretrial preparation, *voir dire*, conduct during the trial and conduct when the trial court sentenced their client. Judge Merz recommended that this claim be denied on the merits. As a means of analysis, the Court will address the four areas of allegedly deficient performance by trial counsel in the above order.

*First*, the Petitioner contends that his trial counsel failed to provide effective assistance during the pretrial portion of the prosecution, because they failed to file any motions. In particular, he focuses upon the failure to file a motion to suppress or a motion challenging the constitutionality of Ohio's then, newly enacted death penalty statutes. Without addressing the question of whether trial counsel's performance was deficient in those regards, the Petitioner has not shown that the failure to file either type of motion prejudiced his defense. The Petitioner has not suggested what evidence was subject to suppression. A review of the transcript of the Petitioner's trial reveals that the state did not introduce any evidence seized as a result of a search of the Petitioner or any statement he made during a custodial interrogation. Therefore, it is difficult to imagine what evidence could have been suppressed. With respect to the failure of trial counsel to file a motion challenging the constitutionality of Ohio's capital punishment statutes, this Court, *infra*, addresses and rejects the Petitioner's numerous constitutional challenges to those statutes. Therefore, the failure of his trial counsel to file a pretrial motion raising the same arguments cannot have prejudiced his defense.

*Second*, the Petitioner contends that his trial counsel provided ineffective assistance during the *voir dire*. This contention has two sub-parts. Initially, Zuern argues that his counsel should have objected to

the prosecutor's use of peremptory challenges to excuse those jurors who expressed any type of qualms about imposing the death penalty. Above, this Court has concluded that it was not unlawful for the prosecutor to have used the state's peremptory challenges in that manner. Therefore, without addressing the question of whether the failure to object to that practice was performance that could be classified as deficient, the Court concludes that it could not have been prejudicial to the Petitioner. In addition, Zuern contends that his counsel were ineffective, because they permitted the prosecutor to indoctrinate the jury to return a sentence of death. Above, this Court has explained that the alleged indoctrination by the prosecutor was nothing more than a correct statement of the law of Ohio. Therefore, the Petitioner was not prejudiced by the failure of his counsel to object to the prosecutor's *voir dire.*

*Third,* the Petitioner contends that trial counsel provided ineffective assistance during the trial phase of his prosecution. The Petitioner contends that trial counsel was ineffective in a number of regards, including matters which form the basis of some of his other Claims, as well as in additional alleged areas. As a means of analysis, the Court will initially address the Petitioner's assertions which relate to his other Claims, following which it will turn to the additional alleged shortcomings of counsel.

The Petitioner contends that his trial counsel were ineffective, because they failed to object when evidence was introduced concerning his post-arrest silence; because they allowed the introduction of character evidence; because they failed to insist that Taylor be removed from the jury, after she had initially mentioned that she had seen the television report concerning the Petitioner; because they failed to

object to the "acquittal first" instruction; because they failed to object to an invalid death penalty specification (which is the subject of the Petitioner's Twenty–Fifth Claim, discussed below); because they permitted their client to waive the presentation of mitigating evidence; and because they failed to object to the improper definition of reasonable doubt used by Judge Morrissey in the jury instructions.[53] Throughout this decision, this Court has rejected the Petitioner's Claims which incorporate the foregoing assertions. For those reasons, this Court concludes that his trial counsel did not render ineffective assistance, by failing to object to those matters. Since the Petitioner's rights were not violated by the actions which give rise to those assertions, the failure of Petitioner's trial counsel to object did not constitute deficient performance.

■■■ As is indicated, the Petitioner also raises some additional areas where his trial counsel were allegedly ineffective. Initially, he states that the failure of his trial counsel to give an opening statement constituted ineffective assistance of counsel. In *Fox v. Ward,* 200 F.3d 1286, 1296 (10th Cir.2000), the Tenth Circuit noted that "it is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel." *See also, Huffington v. Nuth,* 140 F.3d 572, 583 (4th Cir.) (the decision to waive an opening statement "is essentially tactical in nature, and not objectively unreasonable"), *cert. denied,* 525 U.S. 981, 119 S.Ct. 444, 142 L.Ed.2d 399 (1998). However, the Petitioner suggests that an opening statement was crucial in this case, because the defense theory was predicated upon contesting the element of prior calculation and design, rather than denying his

---

53. The Petitioner also mentions Lewis' statements to the jury that the Petitioner was incarcerated in the CCI because he had committed an earlier murder and that he would not hesitate to do it again. Those statements

form the basis of Petitioner's Sixth Claim, which is discussed below. Suffice it to say that counsel were not ineffective in that regard, since they immediately moved for a mistrial after those statements were made.

involvement in the stabbing.[54] Thus, Petitioner contends that "it was essential to explain to the jury what to look for in the State's case and why no defense witnesses would be presented." Doc. # 326 at 107. Judge Merz concluded that this argument was without merit, because the function of an opening statement is to summarize the evidence one intends to introduce and defense counsel did not intend to introduce any evidence. This Court cannot conclude that trial counsel performed deficiently by failing to give an opening statement. Rather, that decision fell within the wide range of discretion afforded to counsel. Indeed, there was an acceptable reason for declining to give an opening statement, since to do so would have required that Petitioner's counsel concede to the jury that their client was a murderer. Accordingly, the Court rejects the Petitioner's assertion that the failure to give an opening statement constituted ineffective assistance of counsel.

In addition, Petitioner argues that his counsel were ineffective, because they did not cross-examine Lewis. Petitioner suggests that such cross-examination could have focused upon Lewis' status as an inmate in an attempt to diminish his credibility. This Court cannot conclude that the failure to cross-examine Lewis prejudiced the Petitioner's defense. During his direct examination, Lewis told the members of jury that he was an inmate at the CCI and informed them of his prior criminal record. The failure to cause that witness to repeat those matters on cross-examination did not deprive the Petitioner of a fair trial, i.e., one whose result was reliable. *Strickland, supra.* Accordingly, the Court concludes that trial counsel were not ineffective by failing to cross-examine Lewis.

▆▆ Petitioner also contends that his trial counsel were ineffective, because they failed to request a brief continuance, in order to prepare for cross-examination, af-

ter Joseph had testified as a surprise witness. Without considering the question of whether trial counsel were deficient in that regard, this Court cannot conclude that any alleged deficiency caused the Petitioner to suffer prejudice. Despite having been given the opportunity to conduct discovery in this proceeding, the Petitioner has not suggested what information his counsel would have been able to obtain during a brief continuance, which would have permitted them to cross-examine Joseph more effectively. According, the Court concludes that counsel's failure to request such a brief continuance did not constitute ineffective assistance of counsel.

*Fourth,* the Petitioner contends that his trial counsel were ineffective, because they permitted Judge Morrissey to sentence their client, in part, on the basis of a presentence investigation report which they had neither seen nor had the opportunity to rebut. Above, this Court has concluded that the Petitioner did not suffer prejudice, as a result of Judge Morrissey's mention that he had considered that report, since the appellate courts conducted an independent review of the evidence, without reference to that report (which was not part of the record on appeal), and concluded that the evidence established beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Given that a claim of ineffective assistance of counsel is based upon two factors, deficient performance and prejudice to the defense as a result of that deficient performance, the Petitioner has failed to demonstrate that he was denied effective assistance of counsel in this regard. Therefore, the Court rejects the Petitioner's contention that his counsel were ineffective in this regard.

Accordingly, the Court overrules the Petitioner's Objections to the Initial and Supplemental Reports and Recommendations of the Magistrate Judge, to the extent

---

54. Given the evidence presented at the Petitioner's trial, it would have been impossible to argue in a reasonable manner that the Petitioner had not stabbed Pence.

those Objections relate to the Eighteenth Claim.

### R. Nineteenth Claim

With this Claim, the Petitioner argues that his conviction and sentence violate the Sixth Amendment, because his appellate counsel failed to render effective assistance. This Claim is predicated upon the Petitioner's Claims which were found to be procedurally defaulted, because of the failure of his appellate counsel to raise them on his direct appeal. Throughout this Decision, this Court has concluded that the Petitioner has failed to demonstrate cause and prejudice, with respect to all of those Claims, given that appellate counsel did not fail to provide effective assistance by not raising those issues during the Petitioner's direct appeal. Therefore, this Court concludes that the Petitioner has not demonstrated that his appellate counsel were ineffective in this regard. Accordingly, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, as those Objections relate to the Petitioner's Nineteenth Claim.

### S. Twentieth Claim

With this Claim, Zuern asserts that Ohio's statutory provisions governing its capital punishment scheme violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.[55] In support of this Claim, the Petitioner has put forward a number subarguments. Judge Merz, after noting that the Respondent has not contended that this Claim is procedurally defaulted, recommended that this Court reject it on the merits. The Petitioner has objected to that recommendation. As a means of analysis, the Court will address the Petitioner's arguments in the order in which they appear in his Objections.

■ Zuern contends that the Ohio capital punishment scheme is unconstitutional, because it invests unfettered discretion in prosecutors to decide who shall be charged with capital offenses. This Court rejects that assertion. In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court rejected the argument that Georgia's death penalty statutes were unconstitutional, because Georgia law invested too much discretion with prosecutors to select those persons who would be so charged. *See Id.* at 199, 96 S.Ct. 2909 (Opinion of Stewart, Powell and Stevens); *Id.* at 225, 96 S.Ct. 2909 (Opinion of White, joined by Burger and Rehnquist).

Zuern argues next that the Ohio capital punishment statutes violate the substantive component of the Due Process Clause of the Fourteenth Amendment. This is a broad challenge to the constitutionality of the death penalty under any circumstances, rather than an argument that the particular circumstances of his prosecution violated substantive due process. In particular, the Petitioner contends that the right to life is a constitutionally protected, fundamental right. In addition, the Petitioner asserts that the death penalty cannot be imposed, unless the state has shown that it possesses a compelling interest and that the death penalty is the least restrictive means of achieving that interest. This Court rejects the Petitioner's substantive due process challenge to Ohio's capital punishment statutes. In *Gregg, supra,* and its progeny, the Supreme Court turned aside broad attacks on the constitutionality of the death penalty. Although

---

55. In his Objections to the Initial Report and Recommendations of the Magistrate Judge, the Petitioner also cites provisions of the Ohio Constitution. *See* Doc. # 326 at 120–132. Since this Court is without the jurisdiction, in a habeas proceeding, to adjudicate claims predicated upon the denial of a state constitutional right, this Court does not consider the provisions of the Ohio Constitution cited by the Petitioner. *See Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (reemphasizing that "in conducting habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws, or treaties of the United States").

those cases were decided under the Eighth Amendment, rather than under the Fourteenth, those decisions nevertheless support this Court's conclusion. In his concurring opinion to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Justice Marshall indicated that a substantive due process challenge to the death penalty, based upon the premise that the taking of life must be supported by a compelling state interest, merges with the Cruel and Unusual Punishments Clause contained in the Eighth Amendment. *Id.* at 359 n. 141, 92 S.Ct. 2726. *See also, In re West*, 119 F.3d 295, 296 (5th Cir.1997) (summarily rejecting argument that Texas death penalty statutes violate substantive due process, because Supreme Court had previously decided that those statutes do not violate the Eighth Amendment).

■ The Petitioner also contends that Ohio's capital punishment statutes are unconstitutional, because the death penalty is imposed in a racially discriminatory manner. In support of that assertion, he states that 60% of the individuals on Ohio's death row are from racial minorities. In *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Supreme Court rejected a challenge to Georgia's capital punishment scheme, a challenge which was predicated upon statistical evidence that the death penalty was most frequently imposed upon two types of defendants, to wit: African–Americans defendants and all defendants who have murdered whites. The *McCleskey* Court held that to prevail with such a challenge, a defendant "must prove that the decisionmakers in *his* case acted with a discriminatory purpose." *Id.* at 292, 107 S.Ct. 1756

(emphasis in the original). The *McCleskey* Court also concluded that the statistical evidence presented therein did not meet that burden of proof. Herein, the Petitioner has neither presented evidence nor argued that the decisionmakers in his case acted with such a purpose. Accordingly, this Court rejects his argument that Ohio capital punishment statutes are unconstitutional, because the death penalty is imposed disproportionately upon minorities and those who have murdered whites.

■ Zuern asserts that Ohio's capital punishment statutes violate the Eighth Amendment, because the death penalty is neither the least restrictive nor an effective means of deterrence. Given that the Supreme Court has repeatedly rejected that argument (*see e.g., Gregg, supra* ), this Court declines to hold the Ohio statutory scheme unconstitutional on that basis.

■ Zuern argues that Ohio's capital punishment scheme is unconstitutional, because of the manner in which those statutes address the question of mitigating factors. In particular, the Petitioner challenges those statutes on the ground that they impose upon a defendant the obligation of proving the existence of a mitigating circumstance by the preponderance of the evidence. This Court rejects that argument. In *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Supreme Court rejected the defendant's argument that Arizona's capital punishment scheme was unconstitutional, because it imposed upon him such an obligation. *Id.* at 649–50, 110 S.Ct. 3047.[56]

■ In addition, the Petitioner argues that Ohio's capital punishment statutes are

---

**56.** In support of this argument, *Zuern* relies upon *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990), wherein the Ninth Circuit concluded that Arizona's capital punishment statutes were constitutionally infirm, because they imposed the burden of proving mitigating circumstances upon the defendant. The Supreme Court agreed to hear *Walton* in order to resolve the conflict

between the Ninth Circuit and the Arizona Supreme Court concerning the constitutionality of Arizona's death penalty. *See* 497 U.S. at 647, 110 S.Ct. 3047. The Supreme Court rejected the Ninth Circuit's resolution of the question of whether a state can require a defendant to prove the existence of mitigating circumstances. Therefore, *Adamson* does not constitute authoritative precedent in support of this argument.

unconstitutional, because they require a jury to decide whether aggravating circumstances exist during the guilt phase of the trial, rather than during the penalty phase. This Court cannot agree. In *Tuilaepa v. California*, 512 U.S., 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Supreme Court explained that its capital punishment cases have addressed two different aspects of the decision making process in death penalty cases, the eligibility decision and the selection decision. With respect to the eligibility decision, the Supreme Court wrote:

> To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) *at either the guilt or penalty phase.* See, e.g., *Lowenfield v. Phelps*, 484 U.S. 231, 244–246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Zant v. Stephens*, 462 U.S. 862 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

*Id.* at 971–72, 114 S.Ct. 2630 (emphasis added). California, like Ohio, required the jury to find the existence of an aggravating circumstance during the guilt phase of the trial. *See also Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

■ Zuern next takes aim at Rule 11(C)(3) of the Ohio Rules of Criminal Procedure, which provides:

> If the indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interests of justice.

Since Ohio law makes only those defendants who are found guilty of one or more specifications or aggravating circumstances eligible for the death penalty, Petitioner contends that this provision imposes an impermissible risk of death on capital defendants who chose to exercise their right to a jury trial, given that there is no corresponding provision applicable to defendants who so choose to exercise their right to such a trial. In support of that argument, the Petitioner relies upon Justice Blackmun's concurring opinion in *Lockett v. Ohio*, 438 U.S. 586, 617–19, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In his concurrence, Justice Blackmun stated that Rule 11(C)(3) violated *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), because the trial court could dismiss the specifications asserted against only those defendants who plead guilty or no contest. No other member of the Court joined Justice Blackmun's analysis of Rule 11(C)(3). In *Jackson*, the Supreme Court held that the capital punishment provision contained in the federal kidnaping statute imposed an unconstitutional burden on the right to a jury trial. That statute authorized only the jury to return a verdict of death; therefore, a defendant charged with kidnaping who plead guilty could not be sentenced to death. In *Corbitt v. New Jersey*, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978), the Supreme Court distinguished *Jackson*. In *Corbitt*, the defendant was charged with first degree murder. The law of New Jersey separated murder into first and second degree, with the jury determining which offense the defendant had committed. If convicted of first degree murder, the mandatory sentence was life imprisonment. The punishment for second degree murder was a term of imprisonment not to exceed 30 years. Although the New Jersey statutes did not permit guilty pleas or Bench trials, a defendant was permitted to plead no contest. If such a plea was accepted, the Court had the discretion to sentence the defendant in accordance with either the first or second degree murder provisions. After having been convicted of first degree murder, Corbitt was sentenced to a mandatory term of life imprisonment. Before the Supreme Court, he argued that the New Jersey statutes violated *Jackson*. The Supreme Court disagreed, noting, *inter alia*, that a defendant could not invariably avoid a mandatory

term of life imprisonment by pleading no contest, since the judge accepting the plea retained the authority to impose such a penalty. 439 U.S. at 217–18, 99 S.Ct. 492.[57] O.R.Crim. P. 11(C)(3) is similar to the New Jersey statutes in *Corbitt* and unlike the federal kidnaping statute in *Jackson*, in that Rule 11(C)(3) does not automatically prevent the imposition of the death penalty for a defendant who has plead guilty. Rule 11(C)(3) is phrased in permissive terms, providing that the court "*may* dismiss" the specifications. Indeed, defendants have been sentenced to death in Ohio, despite having entered guilty pleas. *See e.g., State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, *cert. denied,* —— U.S. ——, 120 S.Ct. 252, 145 L.Ed.2d 212 (1999); *State v. Fautenberry*, 72 Ohio St.3d 435, 650 N.E.2d 878, *cert. denied,* 516 U.S. 996, 116 S.Ct. 534, 133 L.Ed.2d 439 (1995). Based upon the distinction recognized by the Supreme Court in *Corbitt,* this Court concludes that Rule 11(C)(3) does not violate the rule established in *Jackson.* Accord, *Scott,* 58 F.Supp.2d at 796.

▮ Petitioner argues next that Ohio's capital punishment statutes are unconstitutional, because of the lack of adequate proportionality review on appeal. For instance, the Petitioner contends that such review is hampered by the fact that the Ohio statutes only require courts to report minimal information on death penalty cases. In addition, Ohio law does not require that a jury or three-judge panel which recommends life imprisonment, rather than death, to identify the mitigating factors which underlie the recommendation. According to Zuern, the proportionality review process is also flawed, because the Ohio Supreme Court has held that a court of appeals meets its statutory obligation to conduct such a review, if it reviews the cases decided by the appellate court in which the death penalty was imposed. *State v. Steffen,* 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), *cert. denied,* 485 U.S. 916, 108 S.Ct. 1089, 99 L.Ed.2d 250 (1988). The Court rejects the Petitioner's argument that Ohio capital punishment statutes violate the Constitution, because they do not provide for adequate proportionality review upon appeal. In *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Supreme Court rejected the argument that the Eighth Amendment requires that the state provide such a review on appeal. Therefore, the Petitioner's assertions that Ohio's proportionality review is inadequate cannot constitute a violation of that constitutional provision.[58]

Accordingly, the Court overrules the Petitioner's Objections to the Magistrate Judge's Initial and Supplemental Reports and Recommendations, to the extent those Objections relate to his Twentieth Claim.

### T. Twenty–Fifth Claim

With this Claim, the Petitioner argues that his rights under the Eighth and Fourteenth Amendments were violated, because he was charged with an invalid specification or aggravating circumstance. In particular, he focuses upon Ohio Revised Code § 2929.04(A), which provides in pertinent part:

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the

---

**57.** The *Corbitt* Court also noted that *Jackson* was distinguishable since it involved the death penalty, which is "unique in its severity and irrevocability." 439 U.S. at 217, 99 S.Ct. 492 (citation and internal quotation marks omitted). Since this case arises from the imposition of the death penalty upon the Petitioner, that distinguishing factor is not applicable.

**58.** The Petitioner also contends that the imposition of the death penalty constitutes cruel and unusual punishment, in violation of the Eighth Amendment. Such an argument has been repeatedly rejected by the Supreme Court. *See e.g., Gregg, supra.*

Revised Code and proved beyond a reasonable doubt:

\* \* \* \* \* \*

(6) The victim of the offense was a law enforcement officer, as defined in section 2911.01 of the Revised Code, whom the offender had reasonable cause to know or knew to be a law enforcement officer as so defined, *and either* the victim, at the time of the commission of the offense, was engaged in the victim's duties, *or* it was the offender's specific purpose to kill a law enforcement officer as so defined.

(Emphasis added). The indictment charged the Petitioner with three specifications, to wit: that he committed aggravated murder while he was under detention (Ohio Rev.Code § 2929.04(A)(4)); that the victim of the aggravated murder was a law enforcement officer, who was engaged in the performance of his duties (Ohio Rev.Code § 2929.04(A)(6)); and that the victim of the aggravated murder was a law enforcement officer and the Petitioner's specific purpose was to kill a law enforcement officer (Ohio Rev.Code § 2929.04(A)(6)). Petitioner contends that it was improper to charge him with both alternatives contained in § 2929.04(A)(6), since that statute sets forth one aggravating circumstance which may be accomplished in either of two ways. Zuern argues that submitting § 2929.04(A)(6) to the jury as two specifications or aggravating circumstances, rather than as one, skewed the weighing process required by 2929.04(D). Under that statutory provision, the death penalty can be imposed only if the state proves, beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors. Judge Merz recommended that the Court hold this Claim to be barred by procedural default, the failure of the Petitioner to raise it on his direct appeal. Since the Petitioner has failed to show cause and prejudice for that default, this Court concurs with that recommendation.

The Petitioner contends that he can show cause and prejudice, by the ineffective assistance of his appellate counsel in failing to raise this issue during his direct appeal. In *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), the Ohio Supreme Court addressed an analogous situation. Therein, the trial court had instructed the jury on a number of aggravating circumstances, including two under § 2929.04(A)(7), which makes the commission of an aggravated murder during the perpetration of certain specified offenses an aggravating circumstance. In that case, the trial court had charged, as separate aggravating circumstances, that the defendant had committed aggravated murder during the course of a kidnaping and during the course of an aggravated robbery. Although the Ohio Supreme Court concluded that the charge was "unnecessarily cumulative" and, therefore, should have been merged, that court did not reverse the defendant's sentence of death, since the failure to merge the two had not had an effect on the jury's judgment. Herein, the Petitioner did not present *any* mitigation evidence; therefore, the failure to merge the two alternative manners of establishing the aggravating circumstance set forth in § 2929.04(A)(6) cannot have had an impact upon the sentence imposed upon the Petitioner, i.e., could not, in and of itself, have caused aggravating circumstances to outweigh mitigating factors. Consequently, if appellate counsel had raised this issue on appeal, it would not have resulted in the reversal of Petitioner's sentence. Thus, the Petitioner was not prejudiced by the allegedly defective representation by appellate counsel.

Accordingly, the Court overrules the Petitioner's Objection's to Judge Merz' Initial and Supplemental Reports and Recommendations, to the extent that those Objections relate to Petitioner's Twenty-Fifth Claim.

*II. Respondent's Objections (Docs. # 321 and # 332)*

In his Initial and Supplemental Reports and Recommendations, the Magis-

trate Judge recommended that this Court grant a conditional writ to the Petitioner on his Sixth Claim. With that Claim, Zuern argues that his conviction and sentence violated the Due Process Clause of the Fourteenth Amendment, because the trial court refused his request for a mistrial. During the direct examination of Lewis, the prosecutor questioned him about a conversation between himself (Lewis) and Officer Ron Doyle, which had occurred a mere matter of hours before Zuern killed Pence:

> Question: What did you tell Officer Doyle?
> Answer: I told Officer Doyle, "Officer Doyle, can we talk, could we rap? I'm telling you, you know, Zuern has a shank or a knife or whatever you want to call it." I said, "He is crazy, man, he is in here for murder, and he won't hesitate to do it again."

Doc. # 98 at 855. At that point, Petitioner's counsel moved for a mistrial, which the court denied. *Id.* at 856. The court did, however, instruct the jury to disregard Lewis' comment:

> The Court: Members of the jury, you are admonished at this time that any testimony just offered was a gratuitous remark by the witness, and is excluded from your consideration as any part of the evidence in this matter.

*Id.*

In his Initial Report and Recommendations, Judge Merz reasoned that Lewis' comment was so prejudicial that the court's instruction could not alleviate that prejudice. In particular, that judicial officer noted that the only contested issue in the Petitioner's trial was whether he had acted with prior calculation and design. According to Judge Merz, the lay opinion testimony of Lewis, that Petitioner would not hesitate to murder again, was pertinent to that contested issue, and the jury would not be able to ignore that testimony,

despite the trial court's instruction, since Lewis had predicted in his conversation with Doyle that which in fact occurred later that evening. In his Supplemental Report and Recommendations, Judge Merz emphasized that Lewis' testimony constituted much more than the mention that Petitioner had previously committed a murder; that testimony also indicated that Lewis had predicted approximately six hours before Pence was murdered that Petitioner was capable of murdering again.

The Respondent has presented a multi-pronged attack upon Judge Merz' recommendations relating to Petitioner's Sixth Claim. Initially, Respondent notes that habeas relief is available only when a conviction or sentence violates a federal constitutional right. He contends that the Magistrate Judge breached that rule, by improperly recommending that relief be granted on the basis of a violation of a state rule. This Court does not agree. The Sixth Circuit has held that a violation of a state evidentiary rule can also constitute a deprivation of due process.[59] *Brown*, 187 F.3d at 578. Moreover, Judge Merz did not ground his recommendation upon state law.

The Respondent also argues that Judge Merz' recommendation will have the effect of creating a *per se* rule, that a mistrial must be granted, whenever evidence that a defendant has previously committed another criminal act is improperly placed before the jury. Once again, this Court cannot agree. Lewis' testimony was not limited to the reason that Zuern was incarcerated in the CCI; rather, Lewis also testified that he had told Doyle, approximately six hours before Pence was murdered, that Petitioner would not hesitate to murder again. Indeed, Judge Merz noted such in his Reports and Recommendations.

The Respondent also argues that Judge Merz improperly applied the law, because

---

**59.** Of course, the question remains whether Lewis' unsolicited statement, coupled with the failure of the trial court to grant a mistri- al, constituted a violation of Petitioner's due process rights. This Court considers that issue below.

he neglected to follow the Sixth Circuit's rule that the jury is presumed to follow the court's instructions and that, therefore, the trial court's curative instruction eliminated the prejudicial effect of Lewis' extemporaneous remark. In particular, the Respondent relies upon *United States v. Forrest,* 17 F.3d 916 (6th Cir.), *cert. denied,* 511 U.S. 1113, 114 S.Ct. 2115, 128 L.Ed.2d 673 (1994). Therein, the Government asked one of its witnesses whether he was aware of where the defendant had been living. He blurted out that he knew that the defendant had been living at a particular address for the past five months, since the time he had been released from a penal institution for robbery. *Id.* at 920. The court immediately instructed the jury to disregard the witness' comment. On cross-examination, that witness once again stated that the defendant had been released from prison five months earlier. At that point, defendant moved for a mistrial, which the District Court denied. In concluding that the District Court had not abused its discretion in denying the defendant's request for a mistrial, the Sixth Circuit wrote:

> This case appears similar to *United States v. Hernandez,* 873 F.2d 925, 928 (6th Cir.1989), in which this court determined that a mistrial was not warranted where an improper reference to an unrelated arrest of defendant was unsolicited; the government's line of questioning reasonable; the limiting instruction immediate, clear, and forceful; no bad faith evidenced by the government; and the reference itself only a small part of the evidence against defendant. [In] *United States v. Bowers,* 739 F.2d 1050, 1055 (6th Cir.) (per curiam), *cert. denied,* 469 U.S. 861, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984), [we] noted that lack of deliberateness, a clear and forceful limiting instruction, no bad faith, and testimony amounting to only a small portion of the government's case, would warrant denying a mistrial. *See also United States v. Steele,* 727 F.2d 580, 587–88 (6th Cir.), *cert. denied,* 467 U.S. 1209, 104 S.Ct.

2396, 81 L.Ed.2d 353 (1984) (unsolicited and inadvertent statement that defendant had served time in a South American jail not grounds for mistrial where there was a clear and positive instruction to the jury to disregard the statement); *United States v. Ushery,* 968 F.2d 575, 580 (6th Cir.), *cert. denied,* 506 U.S. 946, 113 S.Ct. 392, 121 L.Ed.2d 301 (1992) (witness's statement that defendant was a convicted felon in response to the prosecutor's request that the witness explain what he meant by his statement that defendant had "a record" not grounds for mistrial where curative instruction given and testimony only a small part of the total evidence against defendant).

*Id.* at 920. *See also, United States v. Harris,* 165 F.3d 1062 (6th Cir.1999) (holding that District Court did not abuse its discretion in refusing to grant defendant's request for a mistrial, when, in response to question by United States Attorney, police officer stated that he was able to locate the defendant by going to the address he had given when last arrested).

In addition, other Circuits have held that a District Court did not abuse its discretion in refusing to grant a mistrial, after a prosecution witness had blurted out that the defendant had engaged in other criminal activity. *See United States v. Torres,* 959 F.2d 858, 860 (10th Cir.) (noting that denial of mistrial was proper where Government informant stated that he knew the defendant on the street as a drug dealer, because the trial court sustained the objection, struck the characterization from the record and instructed the jury to disregard it), *cert. denied,* 506 U.S. 882, 113 S.Ct. 236, 121 L.Ed.2d 171 (1992); *United States v. Rodriguez,* 929 F.2d 1224, 1228 (7th Cir.1991) (District Court did not abuse its discretion by denying request for a mistrial after an officer inadvertently blurted out that the defendant had previously been arrested for participating in a heroin transaction, because District Court sustained defense counsel's objection,

struck the testimony and instructed the jury to disregard any mention of the arrest); *United States v. Blanton*, 793 F.2d 1553, 1564–65 (11th Cir.) (no error in refusing a motion for mistrial where witness inadvertently mentioned that the defendant had been charged with rape, because the District Court instructed the jury that the comment was irrelevant and could not be considered), *cert. denied*, 479 U.S. 1021, 107 S.Ct. 678, 93 L.Ed.2d 728 (1986).

Based upon Sixth Circuit precedent, the Respondent argues that, to ascertain whether the denial of the request for a mistrial violated the Petitioner's due process rights, this Court must consider the following factors, to wit: 1) whether the remark was unsolicited; 2) whether the line of questioning was reasonable; 3) the clarity and forcefulness of any limiting instruction; 4) any bad faith on the part of the prosecution; and 5) whether the remark was a minor or significant part of the total evidence adduced against the Petitioner. *See* Doc. # 321 at 10. This Court agrees with the Respondent's reading of the Sixth Circuit cases upon which he has relied, particularly *Forrest*. The Petitioner has not argued to the contrary. However, it bears emphasis that those decisions set forth the factors that the Sixth Circuit has applied, when deciding *on direct appeal* whether the District Court abused its discretion by denying the defendant's request for a mistrial. Herein, by contrast, this Court must decide whether the Petitioner was denied due process when his request for a mistrial was overruled. Therefore, rather than deciding whether the denial of a mistrial constituted an abuse of discretion under state law, this Court must determine whether that decision resulted in a trial that was so fundamentally unfair that it constituted a deprivation of due process under the United States Constitution. *See e.g., Brown*, 187 F.3d at 578. The Petitioner cannot be prejudiced if the Court applies the above factors, as Respondent requests, since the standard applicable to due process violations can only be more rigorous than that

set forth by the Sixth Circuit in *Forrest*. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (noting that "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice") (internal quotation marks and citation omitted).

With respect to the first factor (i.e., whether Lewis' remark was unsolicited), the prosecutor did not ask Lewis whether he had told Doyle that Zuern was crazy, that he was incarcerated for murder or that he would not hesitate to murder again. Rather, the prosecutor was attempting to elicit from Lewis the fact that he had told Doyle that Zuern possessed a weapon. Therefore, while the prosecutor's open-ended question ("what did you tell Officer Doyle") may have made it easier for Lewis' answer to include the objectionable statements, it is not apparent that the prosecutor was attempting to solicit such information from Lewis. Thus, this Court cannot find that this factor supports the conclusion that Zuern suffered a deprivation of due process, because his request for a mistrial was denied. With respect to the second factor (i.e., whether the line of questioning was reasonable), Lewis testified that he had told Doyle that Zuern possessed a knife, earlier on the day that Zuern's cell was searched. Thus, the prosecution's line of questioning was completely reasonable, given that it was attempting to introduce evidence that could explain why officers attempted to search Zuern's cell later that day. The third factor, the clarity and forcefulness of any limiting instruction, unquestionably supports the conclusion that the failure to grant a mistrial did not constitute a violation of due process. After Lewis had made the remark in question, Judge Morrissey immediately gave a forceful and clear limiting instruction, telling the members of the jury that they could not consider Lewis' gratuitous remark. It bears emphasis that a jury is

presumed to follow curative instructions. *See e.g., United States v. Waldon,* 206 F.3d 597 (6th Cir.2000). The fourth factor identified by the Sixth Circuit in *Forrest* also supports the conclusion that the denial of the Zuern's request for mistrial did not constitute a deprivation of due process, since there is no evidence or other indication of bad faith on the part of the prosecutor.

Therefore, the Court is left with the question of whether Lewis' remark was a minor or a significant part of the evidence against the Petitioner. To resolve that question, it is necessary to examine Lewis' remark, not in a vacuum but in the context both of the defense presented by Petitioner at trial and of the State's evidence on the crucial element of prior calculation and design. Petitioner has never challenged the fact that he killed Pence. Indeed, his counsel conceded as much during his closing argument in the guilt phase of the Petitioner's trial. *See* Doc.# 99 at 1092 (indicating that the only question before the jury was whether Zuern had acted with prior calculation and design and, thus, was guilty of aggravated murder, as opposed to being guilty of murder). Moreover, there was eyewitness testimony from Burton and other corrections officers who saw the Petitioner stab Pence. Thus, with respect to the question of whether Zuern killed Pence, Lewis' remark was not even a minor part of the evidence. Therefore, the failure to grant the requested mistrial could have constituted a deprivation of due process, only if Lewis' remark was probative of Zuern's prior calculation and design, the one distinguishing factor between the charge of aggravated murder and the lesser offense of murder. In other words, given the concession that Zuern killed Pence (as well as the overwhelming and uncontradicted evidence establishing that fact), this Court must focus exclusively upon the question of whether Lewis' statement was a minor or a significant part of the evidence against Petitioner on the issue of whether he acted with prior calculation and design. To resolve that question, the Court initially reviews the evidence that supports the jury's verdict that he so acted, and, then, places Lewis' objectionable remark in the context of his overall testimony.

As is indicated above, the evidence that the Petitioner acted with prior calculation and design, although sufficient to support his conviction, was not overwhelming. Lewis testified on behalf of the prosecution that the Petitioner had indicated that somebody ought to do something to the guards, because they did not permit prisoners to use all of their allotted time on telephone calls. Doc. # 98 at 853–54. Lewis also testified that, on another occasion, he had observed the Petitioner sharpening a piece of metal into a shank or knife, and that he had informed Doyle of that fact. *Id.* at 854–55. Lewis' testimony that Zuern had a shank was corroborated by Schweinefuss, who testified that an inmate had told him that Zuern had a knife. *Id.* at 888–89. In addition, Joseph testified about his conversations with the Petitioner, after Pence had been murdered. Joseph indicated that the Petitioner told him that he got his "nut" from killing. *Id.* at 864. Joseph also testified that the Petitioner had told him that he (Zuern) had been told by another inmate that his cell would be searched on the evening that Pence was killed. *Id.* at 865. According to Joseph's description of his conversation with the Petitioner, Zuern, after having been warned about the planned search, got out of his bed, put on his pants and waited for the guards to reach his cell. *Id.* at 866. When his cell door had been partially opened, Petitioner lunged with his shank and used his shoulder to exert additional pressure and make the shank enter Pence's body more deeply. *Id.* In addition, Burton, who along with Pence attempted to search Petitioner's cell on the evening of June 9th, testified that, when the officers arrived at the cell, Pence stood in front of the cell door and directed Zuern to come to the door and to stand in front of it. *Id.* at 935. Petitioner complied. *Id.*

Pence then told Zuern to come outside the door and to put his hands against the wall. *Id.* When the cell door was opened, Zuern lunged at Pence, and stabbed that officer in the chest with his shank. *Id.* at 935–37.

Lewis' provided two important bits of testimony for the prosecution. He provided testimony from which the jury could infer that Zuern had an animus against guards. He also testified that he had seen Zuern sharpening a piece of metal into a shank or knife. However, it bears emphasis that Lewis did not indicate that he heard Zuern express his animus towards guards at the same time he (Lewis) saw Zuern fashioning a weapon out of a piece of metal. On the contrary, Lewis explained that, on the last Tuesday of May, 1984, he had engaged Zuern in a conversation, during which the latter had expressed his animus towards guards. According to Lewis' testimony, he saw Zuern making the weapon on either the 5th, 6th or 7th of June, 1984. Thus, the jury could not have believed that Zuern said, while he was fashioning a piece of metal into a knife, that somebody ought to do something to the guards. Moreover, the objectionable testimony by Lewis occurred when he was testifying about his conversation with Doyle concerning Zuern's weapon, and not in connection with his testimony that Zuern had indicated, on the last Tuesday of May, 1984, that something should be done to the guards. Therefore, if a link exists between Lewis' testimony that Zuern had indicated that something should be done to the guards and his objectionable testimony, such a link is tenuous at best.

With the foregoing discussion of the evidence of prior calculation and design and the context of Lewis's testimony in mind, this Court turns to the issue of whether Lewis' statement constituted a minor or a significant part of that evidence. In his Initial Report and Recommendations, Judge Merz noted that Lewis' statement to Doyle was not limited to the reason that Zuern was incarcerated in the CCI; [60] rather, he also indicated that Lewis had told Doyle, approximately six hours before Pence was murdered, that Petitioner would not hesitate to murder again. One could argue that Lewis' statement can be interpreted as his prediction, made approximately six hours before Zuern would murder Pence, that the Petitioner would kill someone. Such a prediction could have some probative force on the question of whether Zuern acted with prior calculation and design, since it might indicate that he had planned that act. Nevertheless, an examination of the language used by Lewis convinces this Court that it's probative force on that issue was minor. Lewis' statements that the Petitioner was crazy and that he would not hesitate to murder again are more logically construed to mean that the Petitioner would act on the spur of the moment, than to mean that he would act with prior calculation and design. It should be noted that Lewis did not indicate that the Petitioner was planning to kill Pence, another corrections officer or anyone else. He merely said the Petitioner would not hesitate to murder again. Even though the evidence that Petitioner had acted with prior calculation and design was not particularly strong, the lack of the probative force of Lewis' remark on that crucial, contested element convinces this Court that said remark constituted a minor part of the evidence against Petitioner on this point.[61]

---

60. If Lewis' statement was limited to telling the jury the reason for Zuern's incarceration at the CCI, the issue would be rather simple. Given that the jury was quite aware of the fact that, when Pence was murdered, Lewis was being housed in an area of that facility where prisoners accused of serious offenses were kept, providing the additional information as to the precise reason for Petitioner's incarceration would have been a minor part of the evidence against him.

61. If the question of whether Zuern had killed Pence had been contested at the trial, this Court's resolution of this Claim in all likelihood would have been different. If that issue had been contested, the statement that Zuern was being incarcerated for murder and that

In sum, the only contested issue at the Petitioner's trial was whether he acted with prior calculation and design. Given the lack of probative value of Lewis' remark on that issue, this Court concludes that said remark was a minor part of the evidence that Zuern had so acted. In addition, this Court has concluded that the prosecutor did not act with bad faith, that the area of inquiry was reasonable and that, although the question asked was broad, Lewis' remark was not directly solicited. Moreover, immediately after Lewis made the objectionable remark, Judge Morrissey clearly and forcefully told the jury that they were to disregard it, a curative instruction which the jury is presumed to have followed. Consequently, all factors identified by the Sixth Circuit in *Forrest* cause this Court to conclude that the denial of the requested mistrial did not constitute an abuse of discretion. However, even assuming a contrary finding, the Petitioner must go beyond demonstrating that Judge Morrissey's decision in that regard constituted an abuse of discretion. He must show that such decision constituted a deprivation of due process (i.e., a decision which rendered Petitioner's trial fundamentally unfair). Given that the due process standard is more onerous (*Donnelly, supra*), this Court is compelled to conclude that the failure to grant the requested mistrial did not deprive the Petitioner of due process of law. Accordingly, the Court sustains the Respondent's Objections to the Initial and Supplemental Reports and Recommendations of the Magistrate Judge as to Petitioner's Sixth Claim.

■ The final question to resolve is whether this Court should issue a certificate of probable cause, in accordance with the pre-AEDPA version of 28 U.S.C. § 2253. The Sixth Circuit has held, in light of *Lindh v. Murphy, supra*, that this version of § 2253 must be applied in cases such as the present one, which were filed

before the effective date of the AEDPA. *See e.g., Norris v. Schotten*, 146 F.3d 314, 322 (6th Cir.), *cert. denied*, 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998); *Arredondo v. United States*, 120 F.3d 639, 640 (6th Cir.1997). Under the post-AEDPA version of § 2253, a petitioner may appeal only if he has obtained a certificate of appealability. Such a Certificate differs from a Certificate of Probable Cause, in that the issues that can be appealed are limited to those set forth in the certificate of appealability. A certificate of probable cause, on the other hand, allows a petitioner to appeal all aspects of the District Court's judgment. In *Norris*, the Sixth Circuit explained:

In the pre-AEDPA world, state prisoners who were denied a writ of habeas corpus from the district court were required to obtain a certificate of probable cause from either the "justice or judge who rendered the [final] order or a circuit justice or judge" before an appeal could be taken to the court of appeals. 28 U.S.C. § 2253 (1994). More important, this court has held that "the grant of [a] certificate of probable cause by the district court, *in spite of [any] limiting provision*, brings before [the court of appeals] the final judgment for review in all respects." *Houston v. Mintzes*, 722 F.2d 290, 293 (6th Cir.1983) (emphasis added). Thus, in stark contrast to the rules prescribed under AEDPA which require an itemization of appealable issues, in the pre-AEDPA context the court could not pick and choose which issues to review.

146 F.3d at 322–23. Therefore, this Court need not decide whether the Petitioner is entitled to appeal each particular Claim, for which this Court has denied relief. Indeed, such a determination would be of no import.

In *Lozada v. Deeds*, 498 U.S. 430, 111 S.Ct. 860, 112 L.Ed.2d 956 (1991), the Su-

---

he would not hesitate to do it again would have carried significant probative force. However, it bears emphasis that the issue of

whether Zuern killed Pence was *not* contested during the trial.

preme Court restated that applicable standards for determining whether to issue a certificate of probable cause:

> In *Barefoot v. Estelle*, 463 U.S. 880, 892–893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), we delineated the standards for issuance of a certificate of probable cause. We agreed with the Courts of Appeals that had ruled that "a certificate of probable cause requires petitioner to make a 'substantial showing of the denial of [a] federal right.'" *Id.*, at 893, 103 S.Ct. 3383 (quoting *Stewart v. Beto*, 454 F.2d 268, 270, n. 2 (C.A.5 1971), *cert. denied*, 406 U.S. 925, 92 S.Ct. 1796, 32 L.Ed.2d 126 (1972)). We also quoted with approval *Gordon v. Willis*, 516 F.Supp. 911, 913 (N.D.Ga.1980) (citing *United States ex rel. Jones v. Richmond*, 245 F.2d 234(CA2), *cert. denied*, 355 U.S. 846, 78 S.Ct. 71, 2 L.Ed.2d 56 (1957)), which explained that in order to make a substantial showing of the denial of a federal right a petitioner who has been denied relief in a district court "'must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are "adequate to deserve encouragement to proceed further."'" 463 U.S. at 893, n. 4, 103 S.Ct. 3383.

*Id.* at 431–32, 111 S.Ct. 860. Given that Judge Merz recommended that this Court grant relief to the Petitioner on his Sixth Claim, even though this Court has chosen not to follow such recommendation, the Court concludes that Zuern has made a substantial showing of the denial of a federal right. The issues on that claim and on many (although not all) of the remaining claims are debatable among jurists of reason. Accordingly, this Court will issue a certificate of probable cause.

It is anticipated that Petitioner will seek leave to appeal *in forma pauperis*. Such a motion will be granted.

The Court grants Petitioner a conditional Writ of Habeas Corpus. If the Petitioner is not retried within the time permitted by the Ohio Speedy Trial Act, he must be released.

This Court directs that judgment be entered in favor of the Petitioner and against the Respondent on the Third Claim, in part (i.e., as it relates to the non-disclosure of the Schweinefuss Memorandum), and in favor of the Respondent and against the Petitioner on all other Claims.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.